LESTER EUGENE SILER, et al.,     )
        )
     **Plaintiff,**       )
        )
v.        )     **No. 3:05-cv-341**
        )     **Jarvis/Guyton**
CAMPBELL COUNTY, TENNESSEE,     )
et al.,        )
        )
     **Defendants.**     )

**MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT
OF DEFENDANTS CHARLES SCOTT, RON McCLELLAN
AND CAMPBELL COUNTY**

**ALLEGATIONS OF PLAINTIFFS' COMPLAINT MATERIAL TO
DEFENDANTS SCOTT, McCLELLAN AND CAMPBELL COUNTY.**

Plaintiffs' Complaint asserts the following claims in nineteen counts. **Counts I through VIII** assert an array of state law claims against Defendants Webber, Franklin, Monday, Green and Carroll ("the five Deputies"), and a claim of statutory liability of Campbell County for the five Deputies' acts pursuant to TENN. CODE ANN. § 8-8-302 (suits against counties for wrongs of deputies). **Count IX** asserts a claim under 42 U.S.C. §§ 1983 and 1988 against the five Deputies, and a repeat claim of statutory liability of Campbell County for the five Deputies' acts pursuant to TENN. CODE ANN. § 8-8-302. **Count X** asserts claims against the five Deputies under the Tennessee Constitution, and a repeat claim of statutory liability of Campbell County for the five Deputies' acts. (**Count X** fails to state a claim upon which relief can be granted since there is no implied private right of action for alleged violations of the Tennessee Constitution.) **Counts XI and XII** assert a breach of duties under state law of Charles Scott (Scott) as Chief

1

Deputy and Ron McClellan (McClellan) as Sheriff, which breach is asserted to be through failure to train, supervise and discipline subordinate deputies. Plaintiffs assert the County's liability for these breaches of duties pursuant to TENN. CODE ANN. § 8-8-302. **Count XII** is against the five Deputies for breach of state law duties. **Count XIII** asserts liability on Sheriff McClellan's bond, presumably against Western Surety Insurance Company. **Count XIV** asserts the same claim with respect to the bond of Chief Deputy Scott and the five Deputies. **Counts XV through XVII** assert direct liability of Western Insurance Company, the issuer/underwriter of the bonds.[1] **Count XVIII** repeats the assertion of statutory liability of Campbell County pursuant to TENN. CODE ANN. § 8-8-302. Finally, **Count XIX** asserts the liability of Campbell County under the Governmental Tort Liability Act (GTLA), based upon employee negligence in failure to train, supervise and discipline deputies.

## STATEMENT OF FACTS

For the sake of space, Defendants will recite here only an overview regarding the factual information which is set forth in detail in the Affidavits of Scott and McClellan submitted in support of Defendants' Motion for Summary Judgment. The events occurring between the five Deputies and Plaintiff Lester Eugene Siler (Siler) are well-known in the public domain through the news media. The five Deputies pled guilty to criminal civil rights violations, and were sentenced to terms in federal penitentiary where they now reside. Specific factual occurrences are contained in the factual allegations of Plaintiffs' Complaint at Paragraphs 9 through 21. The occurrences were recorded on tape and involved the five Deputies handcuffing Siler to a chair in

---

[1]Western Surety Insurance Company was earlier dismissed by agreement, presumably in recognition that suit on the Sheriff's and Deputies' bonds was premature. [Doc. 20] For the same reason, suit against Scott and McClellan on their bonds is premature.

2

his residence and assaulting, threatening, and otherwise coercing him in an egregious, criminal manner to sign a consent to search his residence. Prior thereto, the five Deputies made Plaintiffs Jenny and Dakota Siler leave the residence. The five Deputies arrested Lester and Jenny Siler on charges that were dismissed after the revelation of the audio tape recording.[2]

McClellan was Sheriff of Campbell County for 16 years, from September 1998 to August 2006. (Affidavit of McClellan, Defendants' Exhibit 1, at Paragraph 1.) Sheriff McClellan had no prior knowledge that the five Deputies were going to the Siler residence. (*Ibid.* at Paragraph 4.) McClellan learned from Chief Deputy Charlie Scott that the Campbell County Sheriff's Department (CCSD) deputies were going to the Siler residence. (*Ibid.*; Affidavit of Scott, Defendants' Exhibit 2, at Paragraph 5-6.) Sheriff McClellan was glad to hear of this because for months he had been receiving complaints from residents of the White Oak Community about drug dealing at the Siler residence. (McClellan Affidavit, Paragraph 4.) McClellan periodically asked the CCSD Narcotics Officer, Defendant David Webber, and an officer with the Eighth Judicial District Drug Task Force whether they were investigating Siler, and relayed to them that he was receiving a lot of citizen complaints. (*Ibid.*) McClellan neither expected nor received any specific information beyond general statements such as, "Yeah, we're working on it." (*Ibid.*) Sheriff McClellan neither encouraged nor expected detectives to "get Siler" through any extraordinary or unlawful means. (*Ibid.*) Detective Webber was a veteran officer, who McClellan believed (albeit mistakenly) would carry out any investigation, arrest or prosecution of

---

[2]A few months after these events, the TBI concluded an independent, undercover investigation of drug dealing activities at the Siler residence which resulted in Lester and Jenny Siler being charged with sale of Schedule II Controlled Substances within 1,000 feet of a school. Pursuant to a plea agreement, Lester and Jenny were convicted of lesser-included offenses involving the sale of scheduled narcotics, but without the aggravating factor of proximity to a school.

3

Siler consistent with his training as a deputy and detective, and consistent with citizens/suspects' constitutional rights. Sheriff McClellan was stunned when he ultimately learned what Webber, another veteran officer, and three other deputies had done at the Siler residence. (*Ibid.* at Paragraph 3.) The incident was a one-of-a-kind occurrence in the CCSD in the 16 years McClellan was Sheriff. (*Ibid.* at Paragraph 2.)

Charles Scott is a retired TBI Agent who began working as Chief Deputy with the CCSD approximately 18 months before this incident. (Scott Affidavit, Paragraphs 1-2.) Although Scott's tenure with CCSD prior to this incident was short, during that time, Scott had not personally observed through limited interaction with the five Deputies nor received from citizen complaints or otherwise information that cause him to suspect that the five Deputies were capable of such conduct as occurred at the Siler residence. (*Ibid.* at Paragraph 3.) Prior to the date of incident, July 8, 2004, Scott did not know who Siler was, nor that an investigation of Siler by narcotics detectives was taking place. (*Ibid.* at Paragraph 5.)

On July 8, Patrol Deputy/Defendant Josh Monday informed Chief Scott that they were going to the White Oak Community to serve a warrant on Siler. (*Id.*) Monday asked Chief Scott if he wanted to go. (*Id.*) Chief Scott did not accept the invitation, but did go to lunch with Deputy Monday and three other deputies prior to the Deputies' leaving for the Siler residence. (*Id.*) The fact that Monday asked Chief Scott if he wanted to accompany the officers, and that nothing about the planned trip to the Siler residence was discussed at lunch, leads Scott to believe that certainly Monday, and probably the other three Deputies, were not aware in advance of what apparently Detective Webber had planned for Siler. (*Ibid.*) After lunch, Scott returned to the CCSD. (*Id.*) When Scott saw Sheriff McClellan later that afternoon, he told McClellan

4

that deputies were going to serve a warrant on Siler. Sheriff McClellan seemed pleased to learn this, as Scott would learn, because of the citizen complaints McClellan had been receiving. (*Ibid.* at Paragraph 6.)

Neither McClellan nor Scott had any other information about the Siler investigation, and neither dreamt that the five Deputies, including the two veteran officers — Webber and Franklin — would have encouraged, participated or allowed others to engage in the behavior which led to the five Deputies' guilty pleas to civil rights violations. (McClellan Affidvait, Paragraph 5-7; Scott Affidavit, Paragraphs 3, 9, 11-12.)

McClellan and Scott saw Siler when he was brought into the Jail. (McClellan Affidavit, Paragraph 5; Scott Affidavit, Paragraph 7.) They both went to talk to Siler. (*Ibid.*) Siler was obviously intoxicated, and related in slurred, stammering words what sounded like unbelievable stories of abuse by the five Deputies. (*Ibid.*) McClellan and Scott both particularly recall a claim that the deputies had but battery cables on Siler. (*Ibid.*) Considering that Siler was charged with serious felony offenses, Siler's claims were so bizarre, and he was so intoxicated, McClellan and Scott discounted the possible validity of Siler's seemingly wild claims. (*Ibid.*) Since Siler complained of physical injury, McClellan had the nurse on duty check him. (*Ibid.*) Neither McClellan nor Scott observed any physical injury to Siler, nor did the nurse report any after examining Siler. (*Ibid.*) The absence of physical injury also led McClellan and Scott to discount Siler's story. (*Ibid.*)

A few days later, McClellan and Scott would learn that Siler was telling the truth. Chief Scott received a call from TBI agents who told Scott they had something Scott needed to hear, and asked him to come to the TBI office. (Scott Affidavit, Paragraph 9.) Scott went and listened

5

to the tape. (*Ibid.*) Scott was sickened by what he heard. (*Ibid.*) The TBI agents requested that Scott ask the five Deputies to return to the TBI office and talk further with the agents, which Scott did. (*Id.* at Paragraphs 9-10.)

Scott informed McClellan about the tape the next time he saw him. (Scott Affidavit, Paragraph 11; McClellan Affidavit, Paragraph 4.) McClellan was in disbelief. (*Ibid.*) Scott took McClellan over to the T.B.I. office to hear the tape. (McClellan Affidavit, Paragraph 6; Scott Affidavit, Paragraph 11.) McClellan listened to maybe five minutes and said that was all he needed to hear. (McClellan Affidavit, Paragraph 6.) McClellan was shocked that CCSD Deputies, particularly the veteran officers, had engaged in the behavior recorded on the tape. (*Ibid.*) Normally, when deputies are the subject of a criminal investigation, McClellan awaits the outcome of the investigation to decide the deputies' employment status. (*Ibid.*) However, given the egregious nature of the conduct, and the conclusive nature of the evidence on tape, Sheriff McClellan instructed Chief Scott to immediately terminate of the five Deputies' employment, which Scott did. (McClellan Affidavit, Paragraph 7; Scott Affidavit, Paragraph 11.)

Only three of the five Deputies were full-time employees assigned law enforcement roles. (McClellan Affidavit, Paragraph 3.) The two deputies who appeared to McClellan from the tape, the circumstances and their rank or positions to be the "lead" officers in this "operation" were fully trained, certified and veteran officers. (*Ibid.*) Webber had advanced to the position of Narcotics Detective, and Franklin from Patrol Deputy, to Sergeant, to Detective. (*Ibid.*) Monday had just been promoted the preceding month from Corrections to Patrol, and had not been, but was scheduled to attend, the Academy. Deputy Carroll was not assigned a law enforcement role, and was over Fleet Maintenance. (*Ibid.*) The fifth, Green, was a part-time Civil Process Server.

6

(*Id.*)  Regardless of how little or how extensive their training, McClellan can scarcely imagine what additional training or supervision he could have put in place that would have affected the five Deputies' conduct; anyone — trained or not — would know such conduct was criminal.[3] (McClellan Affidavit, Paragraph 7; Scott Affidavit, Paragraph 12.)

## LAW AND ARGUMENT

I.  **ASSUMING THIS COURT EXERCISES ITS DISCRETION TO HEAR PLAINTIFFS' STATE LAW CLAIMS, SCOTT AND McCLELLAN, INDIVIDUALLY, HAVE EMPLOYEE IMMUNITY UNDER THE GOVERNMENTAL TORT LIABILITY ACT, TENN. CODE ANN. § 29-20-310(b), TO THE CLAIMS ASSERTED AGAINST THEM, WHICH ALLEGE NEGLIGENCE.**

The potential liabilities under the GTLA of a governmental entity and it's employees are like the flip side of a coin; if the immunity of the entity is waived, employees have immunity from suit, and where the immunity of the entity is preserved, employees may be held liable under certain circumstances.  TENN. CODE ANN. § 29-20-310(b) and (c).  *See Hill v. City of Germantown*, 31 S.W.3d 234, 237-238 (Tenn. 2000).  Plaintiffs' 132-paragraph Complaint, asserting nineteen different counts, is nothing if not thorough.  In their detailed Complaint, Plaintiffs have asserted against Defendants Scott and McClellan only state claims of negligence in the training, supervision and discipline of Campbell County Sheriff's Deputies.  (Plaintiffs' Complaint, Count XI, Paragraphs 99-102.)  The only other two counts asserting claims involving Scott and McClellan are suits on their respective bonds, which, if and when ripe, should be

---

[3]One of the Deputies asserted lack of training as a mitigating fact at sentencing.  Understandably, Judge Varlan, dismissed this contention, noting that no training would be necessary for the Deputy to have known the criminal nature of his conduct.

7

asserted against the bond issuer, Western Surety Insurance Company.  (Complaint, Counts XIII-XIV.)

Tennessee law recognizes a theory of recovery against a governmental entity for negligent supervision of employees, even where the underlying tort directly causing plaintiff's injury is a subordinate employee's intentional tort, such as assault and battery.  *Limbaugh v. Coffee Medical Center*, 59 S.W.3d 73 (Tenn. 2001).  The Silers have sued Defendant Campbell County under a negligence theory both in this Court (Complaint, Count XIX), and in state court.  *Siler, et al. v. Webber, et al.*, Campbell County Circuit No. 12,792.  Since Tennessee recognizes the theory of recovery against Campbell County asserted in the Plaintiffs' Complaint, employees of Campbell County, including Scott and McClellan, have immunity pursuant to TENN. CODE ANN. § 29-20-310(b).  Accordingly, this Court should dismiss Scott and McClellan as Defendants.

## II.    DEFENDANT McCLELLAN, INDIVIDUALLY AS SHERIFF, SHOULD BE DISMISSED AS A DEFENDANT FOR THE ADDITIONAL REASON THAT SHERIFFS HAVE IMMUNITY FROM SUIT UNDER TENN. CODE ANN. § 8-8-301 (LIABILITY FOR WRONGS OF DEPUTIES — LIMITATIONS).

Tennessee law recognizes a theory of recovery for "wrongs" of deputies, whether negligent or intentional, in an amount up to the amount of the sheriff's bond ($25,000).  TENN. CODE ANN. § 8-8-302-303, 8-8-103.  The proper party in such suits is the county.  *Id.*  A companion statute, TENN. CODE ANN. § 8-8-301, provides in pertinent part:

> No sheriff, whether elected or appointed, nor any surety on the sheriff's bonds, shall be liable for any wrongs, injuries, losses, damages, or expenses incurred as a result of any act or failure to act on the part of any deputy appointed by the sheriff, whether the deputy is acting by virtue of office, under color of office or otherwise.

It is apparent that the statutory scheme involves a tradeoff: in exchange for waiver of immunity of the County up to the amount of the Sheriff's bond, the Sheriff has absolute immunity from

8

suit.  Since Tennessee Sheriffs have absolute immunity for claims for injury arising from actions

of deputies, this Court should dismiss Defendant McClellan based upon this additional statutory

immunity.

**III.    SCOTT AND McCLELLAN HAVE IMMUNITY UNDER TENNESSEE
COMMON LAW TO THE CLAIMS PLAINTIFFS ASSERT AGAINST THEM.**

In *Youngblood v. Clepper*, 856 S.W.2d 405 (Tenn. Ct. App. 1993), the Tennessee Court

of Appeals ruled, in essence, that the same defense of qualified immunity available to police

officer in § 1983 claims is also available to police officers sued under state law.  *Ibid*. at 407-08;

*Willis v. Neal*, 2006 U.S. Dist. LEXIS 24895 (E.D. Tenn. 2006) (Mattice, J.) (unreported, copy

submitted).  Judge Mattice of this District has concluded that Tennessee common law immunity

under *Youngblood* is co-extensive with qualified immunity[4] under federal law.  *Ibid.*  If the

decision of the officer in the field in *Youngblood*, which concerned control of the flow of traffic,

is a discretionary decision for which immunity applies under Tennessee common law, it

necessarily follows that discretionary decisions concerning the training and supervision of a

sheriff's department likewise qualify for immunity.  Accordingly, this Court should dismiss Scott

and McClellan as Defendants on the basis of Tennessee common law immunity to Plaintiffs'

negligence claims.

---

[4]Although these Defendants do not read Plaintiffs' Complaint as asserting § 1983 claims against
them, in the event the Complaint were so construed, the individual Defendants' qualified immunity is
discussed below.

9

## IV. SCOTT AND McCLELLAN, INDIVIDUALLY, CANNOT BE SUED DIRECTLY ON THEIR BONDS, AND COUNTS XIII AND XIV OF PLAINTIFFS' COMPLAINTSHOULD BE DISMISSED.

To the extent that he is sued under his bond, Sheriff McClellan should be dismissed pursuant to TENN. CODE ANN. § 8-8-301. That statute, quoted above, provides that no sheriff or his surety on the sheriffs' bonds shall be liable for wrongs of deputies. Thus, Sheriff McClellan is not a proper-named party under a theory of liability on his bonds. *Lane, et al. v. Martin, et al.*, 2005 U.S. LEXIS 31969 (E.D. Tenn. 2005) (Jordan, J.) (unreported, copy submitted). As explained by Judge Jordan in *Lane*, the statutory bond of a sheriff (or chief deputy such as Scott) does not create substantive liability. *Ibid.*, p. 5. "It is clear that the official bond of a sheriff creates no cause of action against him and that his official bond binds him no further than he would be liable without it." *Ibid.*, *citing Waters v. Bates*, 227 F. Supp. 462, 465-466 (E.D. Tenn. 1964).

Logically, a suit to recover under an official's bond would only exist after the plaintiff obtains a judgment under some substantive cause of action. Counts XIII and XIV of the Silers' Complaint asserting recovery under the bonds of McClellan and Scott are a substantive nullity. Accordingly, this Court should dismiss Counts XIII and XIV of the Silers' Complaint.

## V. CAMPBELL COUNTY IS ENTITLED TO SUMMARY JUDGMENT BECAUSE PLAINTIFFS CAN PRODUCE NO ADMISSIBLE EVIDENCE OF NEGLIGENCE BY A COUNTY EMPLOYEE, AND FURTHER, CANNOT PRODUCE EVIDENCE THAT SUCH NEGLIGENCE PROXIMATELY CAUSED PLAINTIFFS' ALLEGED HARM AT THE HANDS OF THE FIVE DEPUTIES.

The moving party's burden on a motion for summary judgment is described by the Sixth Circuit as follows:

10

> A moving party bears the burden of demonstrating that there are no genuine issues of material fact, which may be discharged by showing — that is, pointing out to the district court — that there is an absence of evidence to support the nonmoving party's case. The nonmoving party must then put forth significantly probative evidence supporting its claims in order to defeat summary judgment.

*Macy v. Hopkins County School Board*, _____ F.3d _____, _____ (6th Cir. April 12, 2007) (citations and quotations omitted) (for publication, not yet in advance sheets). Consistent with this federal standard governing summary judgment, Defendant Campbell County points out to this Court that the Silers cannot produce "significantly probative evidence" supporting at least two elements of their claims: 1) an employee (other than the five Deputies who committed the *Limbaugh* underlying or "predicate" intentional torts) of Campbell County breached an identified duty of care owed Plaintiffs; and 2) that such breach proximately caused the alleged harm to Plaintiffs which was directly inflicted at the hands of the five Deputies. Obviously, it is incumbent on the Plaintiffs to establish the applicable duty of care, facts showing a breach of that duty, proximate causation and damages. *E.g.*, *Limbaugh v. Coffee Medical Center*, 59 S.W.3d 73 (Tenn. 2001). Campbell County submits that Plaintiffs cannot put forth "significantly probative evidence" supporting all these elements of their claim as is necessary to defeat summary judgment. *Macy*, _____ F. 3d at _____. Absent such proof, Campbell County is entitled to summary judgment on Plaintiffs' GTLA negligence claim.

## ANALYSIS OF PLAINTIFFS' CLAIMS UNDER 42 U.S.C. § 1983

Defendants McClellan, Scott and Campbell County submit that Plaintiffs' Complaint does not assert a claim under 42 U.S.C. § 1983 against them. However, out of an abundance of caution, these Defendants will analyze Plaintiffs' Complaint under federal law.

11

**I.      EVEN IF PLAINTIFFS' COMPLAINT WERE CONSTRUED TO ASSERT A
§ 1983 CLAIM AGAINST McCLELLAN OR SCOTT, THEY WOULD BE
ENTITLED TO SUMMARY JUDGMENT BECAUSE PLAINTIFFS CANNOT
MEET THEIR BURDEN TO INTRODUCE ADMISSIBLE EVIDENCE OF
FACTS WHICH, IF TRUE, WOULD ESTABLISH § 1983 SUPERVISORY
LIABILITY.**

In *Hays v. Jefferson County, Kentucky*, 668 F.2d 869, 872-874 (6th Cir. 1982), the Sixth

Circuit first enunciated the following, now  well-known principles:  1)  supervisory liability must

be based on more than merely the right to control employees; 2)  there must be a direct causal

link between the allegedly unconstitutional acts of subordinate officers and the supervisory

defendants; 3)  supervisory liability based on allegations or proof of improper or inadequate

supervision, training or control does not extend to isolated incidents; 4)  plaintiffs must establish

a sufficiently culpable state of mind of the supervisory official — that the action or failure to act

was to some degree deliberate, rather than inadvertent; 5)  a plaintiff must establish the "direct

responsibility" of the supervisory official for the allegedly unconstitutional actions of

subordinates; 6)  the mere failure to act, even in the face of a statistical pattern of incidence of

misconduct is insufficient; 7)  the supervisor must have either encouraged the specific incident of

misconduct or in some other way directly participated in it, or at a minimum, a plaintiff must

show the supervisory official at least implicitly authorized, approved or knowingly acquiesced in

unconstitutional conduct of subordinate.  *Id.*  Where the constitutional violation is not proven to

be part of a pattern past misconduct, a supervisory official may be held liable only where there is

essentially a complete failure to train the police force, or training that is so reckless or grossly

negligent that future police misconduct is almost inevitable or can be characterized as

"substantially certain to result."  *Id.*

Since *Hays,* the Sixth Circuit has refined the standards governing § 1983 supervisory liability. Supervisory liability cannot be based upon the mere failure to act, and requires proof of a supervisor's **active**, unconstitutional behavior. *Summers v. Leis*, 368 F.3d 881, 888 (6th Cir. 2004; *Combs v. Wilkinson*, 315 F.3d 548, 558 (6th Cir. 2002). That is, the supervisor must have played an active role in the alleged violation of Plaintiff's constitutional rights. *Greene v. Barber*, 310 F.3d 889, 899 (6th Cir. 2002). The supervisor must be shown to have either encouraged the specific incident of misconduct or otherwise directly participated in the conduct that violates Plaintiffs' constitutional rights. *Sheehee v. Luttrell,* 199 F.3d 295, 300 (6th Cir. 1999).

Where a §1983 plaintiff cannot demonstrate that the supervisory official directly participated with the subordinates in the allegedly unconstitutional behavior, more stringent "indirect supervisory liability" standards apply. *Doe v. City of Roseville*, 296 F.3d 431, 439-440 (6th Cir. 2002). A plaintiff cannot meet her burden of proof under a theory of indirect liability merely by showing that the supervisors were sloppy, reckless or negligent in the performance of their duties. *Id.* Where the theory is predicated upon failure to take adequate measures with respect to training, supervision, etc., the failure of the supervisory official to take adequate precautions in this regard must amount to "deliberate indifference" to the rights of citizens. *Doe v. Claiborne County, Tennessee*, 103 F.3d 495, 513 (6th Cir. 1996). "Deliberate indifference" can be established through tacit authorization of abuse, but only where the supervisor was confronted with a **widespread pattern** of constitutional violations **prior to** the incident in question such that he has actual or constructive knowledge of subordinates' unconstitutional behavior. *Id.* Proof that supervisory officials were aware of some "general misconduct" by subordinates, or alleged

13

incidents of harassment brought to their attention, is insufficient. *Lillard v. Shelby County Board of Education,* 76 F.3d 716, 727-728 (6th Cir. 1996). Likewise, proof of passive or mere tacit approval of the "goings on" does not suffice. *Bass v. Robinson*, 167 F.3d 1041, 1048 (6th Cir. 1999). The Sixth Circuit has held that a supervisory failure to train theory would be difficult, if not impossible, to prove where the incident in question was one of the few times in an agency's history where such an event (in that case a shooting) had occurred. *Sova v. City of Mt. Pleasant*, 142 F.3d 898, 904 (6th Cir. 1998). It follows that it would be nearly impossible to prove a supervisory failure to train where the incident had only occurred one time in a county's history, such as in the instant case. Supervisory liability must be assessed "in light of the information the defendants possessed" prior to the alleged constitutional violation by subordinates. *City of Roseville*, 296 F.3d at 439-440.

Even if the Silers' Complaint were construed to assert a claim of § 1983 supervisory liability against McClellan or Scott, the Silers could not establish that any failure to train was a direct causal link of the five Deputies' actions. Courts within the Sixth Circuit have noted the obvious: where subordinates' alleged misconduct is such that any reasonable officer would know it to be unlawful, the failure to train cannot fairly be characterized as the cause of such obvious misconduct. *E.g., Oliver v. City of Berkley*, 261 F. Supp. 2d 879, 885 (E.D. Mich. 2003). Since any lay person would recognize that the five Deputies' actions constituted police misconduct, it cannot fairly be said that some deficiency in their "law enforcement training" caused the Deputies' aberrational behavior. Thus, regardless of the Silers' theories, they would be unable to establish the liability of McClellan or Scott for constitutionally deficient training.

14

Ron McClellan and Charles Scott had no knowledge or information about the five Defendant Deputies' conduct at the Siler residence until after the fact. Therefore, *a fortiori* , McClellan and/or Scott cannot fairly be said to be directly responsible for Siler's mistreatment. Neither could McClellan or Scott be said to have specifically encouraged the five subordinate Deputies to cause Siler harm nor knowingly acquiesced in their behavior. Since McClellan and Scott did not encourage, participate in, or otherwise directly cause the unconstitutional conduct of the five Deputies, McClellan and Scott would be entitled to summary judgment on a theory of § 1983 supervisory liability.

II.     **DEFENDANTS McCLELLAN AND SCOTT, INDIVIDUALLY, WOULD ALSO HAVE QUALIFIED IMMUNITY TO PLAINTIFFS FEDERAL CLAIMS BECAUSE REASONABLE OFFICERS IN THESE DEFENDANTS' RESPECTIVE POSITIONS COULD HAVE BELIEVED THEIR SUPERVISORY ACTIONS LAWFUL.**

Defendants Scott and McClellan would be entitled to summary judgment based on qualified immunity unless Plaintiffs can cite authority that either "squarely governs" the outcome of the specific conduct of McClellan and/or Scott, or supervision by them so obviously wanting that "general tests....clearly establish the answer, even without a body of relevant case law." *Baranski v. Fifteen Unknown Agents of the ATF,* 452 F.3d 433, 447-48 (6th Cir. 2006) (*en banc); Brosseau v. Haugen,* 125 S. Ct. 596, 599 (2004). The burden is on the Plaintiffs to identify what case(s) in this District existed in July 2004, that govern this Court and declared these Defendants' actions unconstitutional with sufficient clarity that a reasonable officer would know that his specific conduct transgressed constitutional law. *Anderson v. Creighton*, 483 U.S. 635, 639-640 (1987). *Dominique v. Telb*, 831 F.2d 673, 677 (6th Cir. 1987); *Cagle v. Gilley*, 957 F.2d 1347, 1348 (6th Cir. 1992). Plaintiffs are not required to prove that the precise conduct in question has

15

been held unconstitutional, but they must show a substantial correspondence between the conduct in question and prior law. *Compare Hope v. Pelzer,* 122 S. Ct. 2508 (2002) *with Brosseau,* 125 S. Ct. at 599. The inquiry is not whether the constitutional right allegedly violated was clearly established in a broad, abstract level of generality, but whether on the specific facts of the case, reasonable officials could have believed that their conduct was lawful. *Brosseau*, 125 S. Ct. at 599. If reasonable officers could disagree on whether conduct violates the Constitution, immunity applies, *Caldwell v. Moore*, 968 F.2d 5953, 595 (6th Cir. 1992). Officers cannot be held individually liable for conduct that was reasonable at the time in question, even though determined in the very case to be unlawful. *Hunter v. Bryant*, 502 U.S. 224, 227-228 (1991).

In the instant case, Defendants McClellan and Scott assert that the Silers cannot cite to the Court case law from the requisite jurisdictional pool governing in this District that clearly defines the unlawfulness of supervisory actions by these Defendants. No cases with sufficiently analogous facts exist to put Defendants on notice in July, 2004, that their conduct was objectively unreasonable under pre-existing law. Without re-argument , Defendants respectfully incorporate herein by reference the factual record cites above. Based on those facts set forth in Defendants' Statement of Facts, McClellan and Scott submit that their supervisory actions did not violate the Constitution.

Even assuming that the Court were to determine, in hindsight, that supervisory acts or omissions of McClellan and Scott were so deficient as to be unconstitutional, Defendants McClellan and Scott assert that the Silers can cite no cases controlling on this Court that establish the contours of their right to have a law enforcement supervisor prevent constitutional violations by deputies who **had not** made known their intentions. Since supervisory officials

16

could have reasonably disagreed about the lawfulness of the acts or omissions of McClellan and

Scott in July, 2004, they are entitled to summary judgment both on the merits on Plaintiffs'

federal claims and qualified immunity.

### III. NO POLICY OR CUSTOM OF CAMPBELL COUNTY[5] WAS THE MOVING FORCE BEHIND ANY ALLEGED VIOLATION OF THE SILERS' CONSTITUTIONAL RIGHTS.

A governmental entity can be held liable under §1983 only where a policy or custom

attributable to the governmental entity caused the violation of the Plaintiffs' constitutional rights.

*Pembaur v. City of Cincinnati*, 475 U.S. 469, 477-479, 106 S. Ct. 1292 (1985); *Holloway v.*

*Brush*, 220 F.3d 767, 772 (6th Cir. 2000) (en banc); *Doe v. Claiborne County, Tennessee*, 103

F.3d 495, 507-12 (6th Cir. 1996). The Plaintiffs cannot base their claims against the County

solely on isolated conduct of persons lacking final policymaking authority. *Fox v. Van*

*Oosterum*, 176 F.3d 342, 347 (6th Cir. 1999); *Doe*, 103 F.3d at 506; *Monell v. Department of*

*Social Services*, 98 S.Ct. 2018 (1978).

> Rather, [Plaintiffs] must show that the [county] itself is the wrongdoer. Under *Monell*, the [county] cannot be found liable unless the Plaintiff can establish that an officially executed policy, or the toleration of a custom within the [City] leads to, causes, or results in the deprivation of a constitutionally protected right.
> * * *
> In addition to showing that the [county] as an entity "caused" the constitutional violation, Plaintiffs must also show a direct causal link between the custom and the constitutional deprivation; that is, [they] must show that the particular injury was incurred because of the execution of that policy.

*Doe*, 103 F.3d at 507 (emphasis in original) (citations omitted).

---

[5]Suit against Defendants in their official capacity is superfluous since Campbell County is a named Defendant. *Alkire v. Irving*, 330 F.3d 802, 810 (6th Cir. 2003); *Kentucky v. Graham*, 473 U.S. 159 (1985).

17

A high degree of municipal culpability of county policymakers must be shown, and a direct causal link between Campbell County's conduct and the deprivation of federal rights. *Board of County Commissioners of Bryan County v. Brown*, 117 S. Ct. 1382, 1385 (1997). Where Plaintiffs challenge a county's training or supervision of deputies, the applicable standard is deliberate indifference to the rights of citizens, which requires proof of a deliberate or conscious choice by county policymakers respecting officer training or supervision. *Brown v. Shaner*, 172 F.3d 927, 930 (6th Cir. 1999). "Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Stemler v. City of Florence*, 126 F.3d 856, 865-66 (6th Cir. 1997). A showing of heightened negligence is insufficient. *Id.* at 865.

Only where the County's policymakers are actually aware of the need for more or different training or supervision, or the need is so obvious and the inadequacy so likely to result in a constitutional violation that knowledge can be inferred, will the deliberate indifference standard be met. *Stemler*, 126 F.3d at 865; *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989). The focus is on the alleged inadequacies of the training or supervision **program** itself rather than the training or supervision of a **single officer**. *Canton*, 489 U.S. at 388.

To establish entity § 1983 liability for failure to train, a plaintiff must demonstrate that policymaking officials "knew to a moral certainty" that their officers would be involved in situations such as the one at issue, which requires proof of **a prior history** of officer misconduct. *See Id.*; *Ferguson v. Leiter*, 220 F.Supp.2d 875, 886 (N.D. Ohio 2002). Entity liability may attach where its officers are shown to have so frequently violated citizens' constitutional rights that the need for further training must have been plainly obvious to policymakers, who

18

nonetheless were deliberately indifferent to the need therefore. *Id.* Conclusory expert testimony that training materials are inadequate is insufficient to defeat summary judgment where there was no evidence of **a pattern** of similar violations in the past. *Id.* The absence prior pattern of unconstitutional misconduct has been oft-cited as grounds for affirming summary judgment for governmental entities. *E.g., Fisher v. Harden*, 398 F.3d 837, 849 (6th Cir. 2005); *Stemler v. City of Florence*, 126 F.3d 856, 865 (6th Cir. 1997); *Sargi v. Kent City Board of Education*, 70 F. 3d 907, 912 (6th Cir. 1995). District courts within this circuit have likewise recognized the pattern or history requirement in failure to train claims. *E.g., Feathers v. Aey*, 196 F. Supp.2d 530, 541-42 (N.D. Ohio 2002), *aff'd* 319 F.3d 843 (6th Cir. 2003); *Ellsworth v. City of Lansing*, 34 F .Supp.2d 571, 577 (W.D. Mich. 1998).

The Sixth Circuit has recently identified four avenues a plaintiff may take to prove the existence of a municipality illegal policy or custom. *Thomas v. City of Chattanooga*, 398 F.3d 426, 429-430 (6th Cir. 2005): 1) the municipality's legislative actions or official agency policies; 2) action(s) taken by officials with final decision-making authority that are unconstitutional in and of themselves; 3) a "policy" of inadequate training or supervision; or 4) a "custom" of tolerance or acquiesce in the violation of citizens' federal rights. *Id.* Where municipal liability is based on an "inaction theory," that is a custom or practice of tolerating the violations of citizens' constitutional rights prior to the incident in question, a plaintiff is required to demonstrate four elements: 1) the existence of a clear and persistent pattern of illegal activity; 2) notice of constructive notice or the part of municipal policymakers; 3) policymakers' tacit approval of, not just the conduct in general of officers, but **unconstitutional conduct**, such that their deliberate indifference in the failure to act can be said to amount to an official "policy of inaction;" and

4)  that the municipal custom was the moving force or direct causal link in the individual officers' deprivation of the specific plaintiff's constitutional rights.  *Id.*  The Sixth Circuit in *Thomas* underscored the degree to culpability that policymakers must have with respect to allegedly unconstitutional prior acts of subordinates.  *Id.* at 430-431.

Defendant Campbell County respectfully submits that Plaintiffs can cite insufficient prior similar incidents of misconduct by CCSD deputies that would put policymaking officials in Campbell County on notice of deficiencies in CCSD's policy, or of the need for additional or different training or supervision.  While Sheriff McClellan may be a final policymaker, Plaintiffs can prove no alleged constitutional violation that was caused by a "policy" decision of Sheriff McClellan.  Rather than discuss the absence of factual proof, Campbell County will reserve further argument until Plaintiffs introduce admissible evidence that would require such a discussion.

## CONCLUSION

For each and all of the foregoing grounds, this Court should dismiss Defendants McClellan, Scott and Campbell County as Defendants in this case.

Respectfully submitted this 29th day of May, 2007.

<div style="margin-left:40%;">

**CHARLES SCOTT, RON McCLELLAN**
**AND CAMPBELL COUNTY**

BY:    <u>s/John C. Duffy</u>
John C. Duffy, BPR# 010424
P.O. Box 11007
Knoxville, TN 37939-1007
(865) 766-0994

</div>

20

## <u>CERTIFICATE OF SERVICE</u>

I certify that a true and correct copy of the foregoing has been filed electronically.  Notice of this filing will be sent by operation of the court's electronic filing system to all parties indicated on the electronic filing receipt.  All other parties will be served by regular U.S. Mail. Parties may access this filing through the Court's electronic filing system.

Dated this 29th day of May, 2007.

<u>/s/John C. Duffy</u>