IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | |
|---|---|
| LESTER EUGENE SILER, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | No. 3:05-cv-341 |
| ) | Jarvis/Guyton |
| GERALD DAVID WEBBER, et al., ) | |
| ) | |
| Defendants. ) | |

### AFFIDAVIT OF RON McCLELLAN

I, Ron McClellan, after being duly sworn according to law, depose and state as follows:

1. I was Sheriff of Campbell County for 16 years, September 1998 -- August 2006.

2. At all times material to the incident involving Lester Eugene Siler (Siler), it was the policy and implemented practice at the Campbell County Sheriff's Department (CCSD) to respect citizens' constitutional rights and respect them as human beings. During my tenure as Sheriff, it is my belief based on my own observations and information learned from others that CCSD deputies knew that I respected the rights of citizens, no matter what crime they had committed, and deputies were expected by me to do likewise. I frequently received contact, both by phone and in person, from citizens about deputies, good and bad. Citizen complaints about deputies usually involved minor infractions or matters such as rudeness, or complaints that the person was not guilty of or did not deserve a traffic ticket and the like. I would handle such complaints without the need for assistance. If a citizen complaint was about a more serious matter and appeared from initial discussion to potentially have substance, a detective would investigate the matter, and report back to me or my Chief Deputy. With respect to the five

1

Deputies involved with Siler on July 8, 2004, I am not aware of any prior complaints or information involving them that led me to believe they were capable of such misconduct involving a suspect, drug dealer or not. It was my practice and my belief that, during my tenure as Sheriff, CCSD Deputies did not think that they could abuse the rights of citizens such as occurred in Mr. Siler's case and "get away with it." In my four terms as Sheriff, this incident involving Siler was a one-of-a-kind occurrence. The five Deputies were terminated from employment within a matter of hours after I learned the true facts.

3. In July 2004 and times material, regular, full-time Deputies employed at the CCSD were trained in compliance with the Tennessee Police Officer's Standards and Training Commission. One of the regular Deputies who went to the Siler residence, Josh Monday, had just been promoted from a corrections officer to a road Deputy a month or so prior to the Siler incident, and was scheduled to go, but had not yet been, to the Academy at Walters State. However, two of the five Deputies who went to the Siler residence were veteran officers: David Webber, the CCSD Narcotics Detective, and Sammy Franklin, a Detective who also had served as a Sergeant in the Patrol Division. Monday, and the other two Deputies were under the supervision of Narcotics Detective Webber and Detective Franklin. One of the five, William Carroll, was over fleet maintenance. Carroll had not been to the Academy, and would not normally be involved in a drug investigation or operation. Likewise, the fifth Deputy, Shane Green, worked part-time serving civil process. Since I was not aware before the fact that the Deputies were carrying out an active investigation of Siler, I was not aware of who Detective Webber presumably recruited to assist him. Nonetheless, I would have believed that I could trust veteran law enforcement officers such as Webber and Franklin to carry out investigations

2

veteran law enforcement officers such as Webber and Franklin to carry out investigations make arrests and prosecute criminals consistent with their training as CCSD Deputies, and consistent with citizens' constitutional rights. I was stunned to learn what the Deputies had done.

4. The first knowledge I had of the five Deputies going to the Siler residence was, after the five had already left the Sheriff's Department, Chief Deputy Charlie Scott informed me that Deputies were going to serve papers on a Lester Eugene Siler. I was familiar with Siler. I had for several months received complaints from residents of the White Oak Community in Campbell County about drug dealing activities at the Siler residence. Citizens were particularly upset because the Siler residence was right near White Oak Elementary School. (After this incident, the T.B.I. arrested Lester and Jenny Siler for sale of schedule II narcotics within 1,000 feet of a school. Pursuant to a plea bargain agreement, Lester and Jenny Siler pled guilty to a felony charge involving sale of narcotics, but the proximity to a school aggravating factor was dropped.) After and while receiving such complaints over the months, I would periodically ask Detective Webber and the Narcotics Officer with the Eighth Judicial District Drug Task Force whether they had any information about, or were investigating, the citizen complaints about drug selling activity at the Siler residence. I related to them generally the information I received from complaining citizens. With drug-related investigations, often involving the use of undercover informants, I did not typically ask, nor expect to receive, specific information from Detectives. Detective Webber or the Drug Task Force Officer would respond to my occasional inquiry about Siler with something along the lines of "Yeah, we're working on it," probably more to satisfy my inquiry than anything. I gave no specific directives to the Detectives, and neither encouraged nor expected them to "get Siler" through any means inconsistent with lawful investigative

3

techniques. As a veteran officer with years experience in drug investigations, I never dreamt that Narcotics Detective Webber might "investigate" Siler in the manner done on July 9, 2004.

5. I was at the Department when Deputies brought Lester Siler to the Campbell County Jail. I and Chief Deputy Scott went to talk to him. Siler appeared obviously intoxicated, stammering with slurred speech. Siler was making seemingly (at the time) implausible claims such as that deputies had put battery cables on him. I did not think there could be any truth to such bizarre claims. I never dreamt that veteran law enforcement officers like Detective Webber and Sgt. Franklin would have allowed conduct by subordinates remotely similar to the civil rights violations for which they pled guilty to occur, much less encourage and participate in it. I observed no physical injury on Siler at the Jail. However, since Siler complained of physical injury, I asked the nurse on duty to check him. The nurse said that she did not find anything wrong with Siler. I thought nothing more about Siler's "stories" at that time. I later saw Sammy Franklin, and told him that Siler was claiming the Deputies did things to him like put battery cables on him. Franklin responded with plausible denials to the effect that "Yeah, I would expect someone with charges like his to say anything."

6. Within several days after the incident, I first learned that there was a problem involving the Deputies' conduct towards Siler. Chief Deputy Scott advised me that he had heard something bad about the Deputies who went to the Siler residence. Chief Scott told me that I needed to listen to a tape that T.B.I. Agents Rick Morrell and Bob Denny had. I went with Chief Scott to their office to listen to the tape. I listened to maybe five minutes and said that was all I needed to hear. I could not believe what I heard. Particularly with veteran officers, I was shocked. Chief Scott and I discussed our mutual belief that the Deputies should be terminated

4

promptly, and not await further investigation or indictment. The tape alone was compelling evidence of a serious employee breach of law enforcement duties. I told Chief Scott: "Those guys need to leave here now." Upon my direction, Chief Scott terminated the five Deputies' employment shortly thereafter.

7. The conduct of the Deputies involving Siler was clearly prohibited by CCSD Policy, as written and in practice. No CCSD deputy could reasonably have believed that such conduct, once discovered, would be condoned by me. The fact that Siler was the subject of numerous citizen complaints did not change how I expected that he be treated by CCSD Deputies. I am unaware of what additional training, policies or supervision I could have had in place within the CCSD that would have affected the aberrational events of July 8, 2004. Any reasonable law enforcement officer would obviously know that, if their superiors found out that such conduct had occurred, their job would be terminated.

Further, affiant saith not.

                                                 Ron McClellan

**STATE OF TENNESSEE** )
                            )
**COUNTY OF** Campbell )

    Personally appeared before me, Ron McClellan, with whom I am personally acquainted, and who acknowledged that he executed the within instrument for the purposes therein contained.

    Witnessed my hand, at office, this the 24th day of May, 2007.

                                                 Notary Public

My Commission Expires: 11\08\09