IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | |
|---|---|
| LESTER EUGENE SILER, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | No. 3:05-cv-341 |
| ) | Jarvis/Guyton |
| GERALD DAVID WEBBER, et al., ) | |
| ) | |
| Defendants. ) | |

## AFFIDAVIT OF CHARLES SCOTT

I, Charles Scott, after being duly sworn according to law, depose and state as follows:

1. I was Chief Deputy at the Campbell County Sheriff's Department (CCSD) from January, 2003 through July, 2006.

2. I received an honorable discharge from the Army with the rank of Sergeant in 1970. I first was employed with the CCSD in 1971 as a jailer/dispatcher, a patrol deputy, and through the ranks to Chief Deputy. I left the CCSD after ten years to attend school full time. I graduated from Lincoln Memorial University with a bachelor's degree in Applied Science. After graduation, I began working for the Tennessee Bureau of Investigation (T.B.I.) as a Field Agent in the Criminal Investigation Division. I was employed by the T.B.I. working in the judicial circuit that includes Campbell County for twenty years before I retired in 2002. After my retirement, I returned to the CCSD in January 2003 as Chief Deputy.

1

3. A few days after the incident involving mistreatment by CCSD Deputies of Lester Eugene Siler (Siler) on July 8, 2004, I learned from T.B.I. Agents of the existence of a tape recording of the incident. I had no knowledge prior to the July 8, 2004 incident that CCSD Deputies intended to or were even capable of such mistreatment of a suspect as I heard on the tape. Prior to this incident, I was not aware from citizen complaints, my own observations during my preceding 18 months as Chief Deputy, or otherwise, of information from which to suspect that any of the five Deputies involved were capable of such conduct. I was sickened when I heard the tape played by T.B.I. Agents a few days after the incident.

4. I neither encouraged, nor condoned behavior by CCSD Deputies such as occurred involving Siler on July 8, 2004. The actions of the Deputies in question on July 8, 2004, most definitely violated CCSD policy, written and in practice, as I knew and implemented it during my 18 months as Chief Deputy between January, 2003 and July 8, 2004.

5. On the day of the incident, July 8, 2004, I spoke briefly at the CCSD with Patrol Deputy Josh Monday. Monday told me that officers were going to the White Oak Community to serve a warrant on someone named Lester Eugene Siler. I did not know Siler. I did not know that an investigation of Siler by narcotics detectives had taken place. I do not believe Josh Monday was aware when I spoke with him at the CCSD of what would later occur at the Siler because he asked me if I wanted to go with the Deputies to the Siler residence. I told Deputy Monday that I did not. Deputy Monday asked if I wanted to have lunch with him, part-time Deputy Shane Green and a Deputy in charge of fleet management, Will Carroll. I did go to lunch with them. During lunch, there was no discussion about the Deputies later going to the Siler residence. We just engaged in general conversation as would be expected during a lunch. After lunch, I returned to the CCSD.

6. Later that day, I saw Sheriff Ron McClellan and relayed to him what Monday had told me about Deputies going that afternoon to serve a warrant on Siler. Sheriff McClellan seemed pleased to learn this. Sheriff McClellan then related to me that he had been getting numerous citizen complaints about drugs being sold out of the Siler home, which was within 1,000 feet of White Oak Elementary School. Neither I nor Sheriff McClellan had any inkling of the mistreatment of Siler that would occur later that day.

7. Later that day I saw on a monitor that Deputies were bringing Siler into the Jail. I went with Sheriff McClellan to see Siler. Siler appeared from his speech and physical appearance to be on drugs. He was talking up a storm, and slurring his words such that I could not understand much of what he said. However, what I heard sounded like bizarre stories. I recall in particular Siler saying that Deputies had done something to him with battery cables. Siler complained that his side was hurting. The Sheriff asked Siler to raise his shirt up, which Siler did. I saw no visible injury. I thought Siler was making up implausible stories to deflect from the fact that he had been arrested on serious felony drug charges. Sheriff McClellan asked the Jail Nurse to examine Siler, I thought perhaps just in case. I left before the nurse examined Siler, but heard she also saw no visible injury.

8. Within a few days, I again saw Josh Monday at the Department. Monday said that Siler had filed a complaint with the T.B.I., and that Monday was going to the T.B.I. Office to be interviewed. Monday did not seem nervous, nor did he ask for advice from me as a former T.B.I. agent, so I was not overly concerned. I assumed, as before, that Siler was making up the seemingly tall tales of abuse perhaps as some perceived leverage concerning the serious felony charges against him. I told Monday to just tell the truth.

9. Within a few days, I received a phone call from Rick Morrell, the Assistant Agent in Charge of the area for the T.B.I. Agent Morrell advised that the Senior Agent in Charge, Bob

3

Denny, was there, and that they had something I needed to listen to. I went to their office and listened to the tape. I was sickened by what I heard. The Agents said that the Deputies interviewed had not told them the truth. They asked me to have the Deputies come back to talk to the Agents a second time, which I did. I did not tell the Deputies about the tape because I did not want to influence the T.B.I. investigation.

10. When I next saw Sheriff McClellan, I informed him about the tape. Sheriff McClellan was in disbelief that CCSD Deputies could do such a thing. I told Sheriff McClellan that he also needed to listen to the tape. We went to the T.B.I. Office for Sheriff McClellan to hear the tape. After we both had heard the tape, Sheriff McClellan and I discussed what to do concerning the Deputies' employment. Typically, when it is that a criminal investigation of officers is taking place, the officers are put on leave until the investigation is completed. However, having heard the tape, and knowing how serious the Deputies' actions were, Sheriff McClellan and I agreed that the only choice was to terminate the Deputies' employment immediately. On Sheriff McClellan instructions, I informed the Deputies that their employment was terminated.

11. Although not the Training Officer for the CCSD, I am familiar generally with the training of sheriffs' deputies based on my 20 years with the T.B.I., and my prior and latest employment with the CCSD. A law enforcement officer would need no particularized training to know that conduct like that engaged in by the Deputies at the Siler residence on July 8, 2004 is obviously improper and unlawful. The Deputies' actions were inconsistent with any law enforcement training program I have ever been aware of, regardless of its depth or scope, including that in place at the CCSD based on my experience as Chief Deputy from January,

4

2003.

 Further, affiant saith not.

                   _Charles F. Scott_
                   Charles Scott

**STATE OF TENNESSEE**  )
             )
**COUNTY OF** Campbell  )

 Personally appeared before me Charles Scott, with whom I am personally acquainted, and who acknowledged that he executed the within instrument for the purposes therein contained.

 Witnessed my hand, at office, this the 25 day of May, 2007.

                   _Alicia J Collins_
                   Notary Public

My Commission Expires: 5-13-09