UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

LESTER EUGENE SILER, et al.,           )
                                       )
          Plaintiffs,                  )
                                       )
v.                                     )     Case No. 3:05-cv-341
                                       )     Judge Edgar/ Magistrate Guyton
                                       )
GERALD DAVID WEBBER, et. al.           )
                                       )
          Defendants.                  )

## MEMORANDUM  AND  ORDER

Pursuant to 28 U.S.C. § 1367(c)(4) this Court has declined to exercise supplemental

jurisdiction over and dismissed without prejudice all of the plaintiffs' Tennessee state law claims.

[Doc. Nos. 117, 123].  The only claims that remain before the Court for adjudication are the federal

civil rights claims under 42 U.S.C. § 1983 and the United States Constitution pleaded in the Ninth

Count of the plaintiffs' complaint. [Doc. No. 1, pp. 17-18].

Plaintiffs assert federal claims under 42 U.S.C. § 1983 against defendants Gerald David

Webber (Webber), Samuel Reed Franklin (Franklin), Joshua James Monday (Monday), Shayne

Christopher Green (Green), William Carroll (Carroll), and Campbell County, Tennessee.  At all

times material to this case, defendants Webber, Franklin, Monday, Green, and Carroll were

employed as deputy sheriffs by the Campbell County Sheriff's Department (CCSD).  Defendants

Webber, Franklin, Monday, Green, and Carroll are sued in both their individual capacities and

official capacities.  A suit brought against these defendants in their official capacities is the same

1

as bringing suit against Campbell County. *Hafer v. Melo*, 502 U.S. 21, 25 (1991); *Will v. Michigan Department of State Police*, 491 U.S. 58, 71 (1989); *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985); *Gean v. Hattaway*, 330 F.3d 758, 766 (6th Cir. 2003); *Pusey v. City of Youngstown*, 11 F.3d 652, 657-58 (6th Cir. 1993); *Hardin v. Straub*, 954 F.2d 1193, 1198-99 (6th Cir. 1992); *Leach v. Shelby County Sheriff*, 891 F.2d 1241, 1245 (6th Cir. 1989).

The complaint alleges that defendants Webber, Franklin, Monday, Green, and Carroll, while acting under color of state law as Campbell County Deputy Sheriffs, violated the plaintiffs' federal civil rights protected under the following provisions of the United States Constitution: (1) Fourth Amendment right to be free from unlawful arrest and imprisonment; (2) Fourth Amendment and Fifth Amendment right to be free from use of excessive force by police officers; (3) Fourth Amendment right to be free from unreasonable searches; (4) Fifth Amendment right to be free from punishment without due process of law; and (6) Eighth Amendment and Fourteenth Amendment right to be free from cruel and inhuman punishment.

The Ninth Count in the complaint further pleads that the plaintiffs are suing Campbell County pursuant to Tenn. Code Ann. § 8-8-302 for the constitutional torts committed by Webber, Franklin, Monday, Green, and Carroll which were done by virtue of and under color of their authority as Campbell County Deputy Sheriffs. Tenn. Code Ann. § 8-8-302 provides: "Anyone incurring any wrong, injury, loss, damage or expense resulting from any act or failure to act on the part of any deputy appointed by the sheriff may bring suit against the county in which the sheriff serves; provided, that the deputy is, at the time of such occurrence, acting by virtue of or under color of the office." The complaint demands compensatory and punitive damages pursuant to 42 U.S.C. § 1983, plus costs and attorney's fees under 42 U.S.C. § 1988.

At all times relevant to this case, defendant Ron McClellan (McClellan) was the Sheriff of Campbell County and defendant Charles Scott (Scott) was the Chief Deputy Sheriff . The complaint does not plead any federal civil rights claims against McClellan and Scott under 42 U.S.C. § 1983. Pursuant to 28 U.S.C. § 1367(c)(4) the Court has declined to exercise supplemental jurisdiction over and dismissed without prejudice all of the plaintiffs' Tennessee state law claims against all defendants including McClellan, Scott, and Campbell County. Since all of the plaintiffs' claims against McClellan and Scott have been dismissed, they are no longer active defendants in this case. There are pending before the Court motions and objections to orders entered by the Magistrate Judge. Defendants McClellan, Scott, and Campbell County have made a joint motion for summary judgment pursuant to Fed. R. Civ. P. 56. [Doc. No. 38]. The summary judgment motion and the close of discovery have spawned other related motions that fall into two main categories: (1) plaintiffs' motions for leave to take additional discovery after the discovery deadline expired and for another extension of time to file a supplemental response in opposition to the summary judgment motion; and (2) motions and objections by the parties concerning whether certain documents and information should be taken into consideration by the Court under Fed. R. Civ. P. 56 when reviewing the summary judgment motion.

To the extent that the pending pretrial motions and objections to the Magistrate Judge's orders concern the plaintiffs' Tennessee state law claims against any of the defendants, said motions and objections are now moot. Any motions or objections made by the plaintiffs concerning their Tennessee state law claims against defendants McClellan, Scott, and Campbell County are moot. Any pending motions or objections made by Campbell County concerning the plaintiffs' Tennessee state law claims are now moot.

3

# I.    __Background__

Plaintiffs filed this civil action on July, 6, 2005.  The case was originally assigned to United States District Judge James H. Jarvis.  On October 4, 2006, District Judge Jarvis entered the first scheduling order. [Doc. No. 29].  The parties were afforded ample time to take discovery.

On May 23, 2007, defendants McClellan, Scott, and Campbell County filed their motion for summary judgment [Doc. No. 38], supported by the affidavits of McClellan and Scott. [Doc. No. 42].  Plaintiffs moved for an extension of time to respond. [Doc. No. 45].  Plaintiffs' counsel stated that an extension of time was necessary to allow plaintiffs to take depositions of the defendants.

The case was reassigned from District Judge Jarvis to District Judge R. Allan Edgar on July 9, 2007. [Doc. No. 50].  On July 13, 2007, the Court granted the plaintiffs' motion for extension of time and ordered the plaintiffs to file their response to the summary judgment motion by the deadline of September 14, 2007. [Doc. No. 51].  On July 16, 2007, the Court entered an amended scheduling order [Doc. No. 52] which provides in part that the deadline for completing all discovery, including the taking of depositions "for evidence," is December 3, 2007.  The amended scheduling order [Doc. No. 52] supercedes the first scheduling order [Doc. No. 29] entered by District Judge Jarvis.

During the first phase of this litigation, plaintiffs were represented by attorneys Michael S. Farley (Farley) and Kristie N. Anderson (Anderson).  Farley moved to withdraw as counsel and for an extension of time for the plaintiffs to respond to the summary judgment motion.  [Doc. Nos. 53, 57, 58].  On October 19, 2007, Magistrate Judge Guyton granted Farley's motion for leave to withdraw as counsel and granted the plaintiffs another extension of time to respond to the summary judgment motion.  At this juncture, the plaintiffs were represented solely by Anderson.

The Court granted the plaintiffs a total of four extensions of time to respond to the summary

4

judgment motion. On November 15, 2007, plaintiffs filed their response opposing the summary judgment motion. [Doc. No. 67]. On November 26, 2007, defendants replied and submitted Scott's supplemental affidavit. [Doc. No. 69]. Plaintiffs did not timely take the discovery depositions of any parties and witnesses. In accordance with the amended scheduling order, the deadline for discovery expired on December 3, 2007.

On December 10, 2007, attorney Herbert S. Moncier (Moncier) gave notice of his entry of appearance as the plaintiffs' new lead counsel. [Doc. No. 70]. Plaintiffs employed Moncier to replace Farley and work together with co-counsel Anderson. Moncier entered his initial appearance after Anderson had filed the plaintiffs' response to the summary judgment motion on November 15, 2007, and after the discovery deadline expired on December 3, 2007. Moncier made motions [Doc. No. 71, 72] seeking another extension of time for plaintiffs to take more discovery and file a supplemental response to the summary judgment motion.

This case is further complicated by the fact that on April 29, 2008, Moncier was suspended from practicing law in the United States District Court for the Eastern District of Tennessee. *In re Herbert S. Moncier*, 550 F. Supp.2d 768 (E.D. Tenn. 2008). Moncier is in the process of appealing his suspension from the practice of law to the Court of Appeals for the Sixth Circuit. Plaintiffs are now represented in this federal suit solely by Anderson.

Although Moncier has been suspended from practicing law in this United States District Court, Moncier is currently licensed to practice law in the state courts of Tennessee. Moncier continues to represent plaintiffs Lester Siler, Jenny Siler, and Dakota Siler in a concurrent, parallel civil action in the Circuit Court of Campbell County, Tennessee, styled *Lester Eugene Siler, et al. v. Gerald David Webber, et al.*, Campbell County Circuit Court, Case No. 12792.

5

## II.  Motion by Defendants McClellan and Scott for Summary Judgment on Federal and State Law Claims; Motion by Defendant Campbell County for Summary Judgment on State Law Claims  [Doc. No. 38]

Defendants McClellan, Scott, and Campbell County move for summary judgment pursuant to Fed. R. Civ. P. 56 to dismiss the plaintiffs' entire complaint. [Doc. No. 38].  The Court concludes that the summary judgment motion is **DENIED IN PART** as follows.

### A.  Defendants McClellan and Scott

The Court pursuant to 28 U.S.C. § 1367(c)(4) has declined to exercise supplemental jurisdiction over and dismissed without prejudice all of the plaintiffs' Tennessee state law claims against defendants McClellan and Scott.  The motion  for summary judgment by McClellan and Scott on the Tennessee state law claims is **DENIED** as **MOOT**.

Defendants McClellan and Scott correctly assert that the plaintiffs' complaint does not plead federal civil rights claims against them under 42 U.S.C. § 1983 and the United States Constitution. Out of an abundance of caution, McClellan and Scott in their summary judgment motion and accompanying memorandum of law go ahead and discuss 42 U.S.C. § 1983 as it may possibly apply to them.  McClellan and Scott raise affirmative defenses, including qualified immunity.

The Court has determined that the complaint does not plead any federal civil rights claims against defendants McClellan and Scott in either their individual or official capacities.  The Ninth Count in the complaint does not plead any claims or causes of action against defendants McClellan and Scott under 42 U.S.C. § 1983.  Consequently, the motion by defendants McClellan and Scott for summary judgment on any federal civil rights claims that the plaintiffs may be seeking to bring against them under 42 U.S.C. § 1983 is **DENIED** as **MOOT**.

6

**B.** **Defendant Campbell County**

Campbell County's motion for summary judgment to dismiss the plaintiffs' Tennessee state law claims is likewise **DENIED** as **MOOT**. The Court has declined to exercise supplemental jurisdiction over and dismissed without prejudice all of the plaintiffs' Tennessee state law claims against Campbell County.

The plaintiffs' federal civil rights claims against Campbell County under 42 U.S.C. § 1983 and the United States Constitution, as pleaded in the Ninth Count of the complaint, remain before the Court for adjudication. The Court will rule on Campbell County's motion for summary judgment but only with regard to the 42 U.S.C. § 1983 federal civil rights claims. Before addressing the 42 U.S.C. § 1983 claims, it is necessary to dispose of other motions and objections to the Magistrate Judge's orders.

**III.** **Plaintiffs' Motion for Relief from Scheduling Order to File Sufficient Response to Summary Judgment Motion [Doc. No. 71]; Plaintiffs' Motion for Pretrial Conference to Enlarge Time for Discovery and Revise Scheduling Order [Doc. No. 72]; Motion by Defendants McClellan and Scott to Stay Discovery Until Court Rules on Issue Whether They are Entitled to Qualified Immunity [Doc. No. 74]**

On December 10, 2007, plaintiffs' counsel, Moncier, made a motion pursuant to Fed. R. Civ. P. 56(f) and 60(b)(1) and (6) captioned "Plaintiffs' Motion For Relief From The Scheduling Order to File A Sufficient Response To Summary Judgment." [Doc. No. 71]. The main thrust of the motion is that plaintiffs want relief from the amended scheduling order and the December 3, 2007, discovery deadline. Plaintiffs move for additional time to take more discovery, including depositions and affidavits, so that the plaintiffs can prepare a supplemental response in opposition

7

to the summary judgment motion. In the event relief from the scheduling order is denied, plaintiffs in the alternative move for a reasonable time period in which to make a decision whether they will move to voluntarily dismiss their complaint without prejudice pursuant to Fed. R. Civ. P. 41(a)(2).

Fed. R. Civ. P. 56(f) provides that if a party opposing a summary judgment motion "shows by affidavit that, for specified reasons, it cannot present facts essential to justify its opposition," then the court in its discretion may: (1) deny the summary judgment motion; (2) order a continuance to enable affidavits to be obtained, depositions to be taken, or other discovery to be undertaken; or (3) issue any other just order. Plaintiffs support their Rule 60(b) motion and seek to comply with Rule 56(f) by filing declarations under penalty of perjury by attorney Kristie Anderson and plaintiff Jenny Siler. [Doc. No. 77]. The motion for relief from the scheduling order [Doc. No. 71] contains attorney Moncier's declaration under penalty of perjury that the statements contained therein are true to the best of his information, knowledge, and belief.

On December 11, 2007, Moncier made a related motion captioned "Plaintiffs' Motion For Conference With The Court; Enlarge Time For Discovery; and Revise Scheduling Order." [Doc. No. 72]. Plaintiffs want the Court to hold another pretrial conference pursuant to Fed. R. Civ. P. 16 to reopen discovery, establish a new and revised discovery schedule, and allow plaintiffs an extension of time to submit a supplemental response in opposition to the summary judgment motion.

Defendants McClellan, Scott, and Campbell County vigorously oppose these two motions. [Doc. No. 73]. Defendants McClellan and Scott moved to stay further discovery until such time as the Court decided the question of qualified immunity. [Doc. No. 74]. In their summary judgment motion [Doc. No. 38], McClellan and Scott contend they are entitled to qualified immunity on the 42 U.S.C. § 1983 federal claims and immunity on the Tennessee state law claims.

8

The motions [Doc. Nos. 71, 72, 74] were referred to Magistrate Judge Guyton pursuant to 28 U.S.C. § 636(b)(1)(A). On February 12, 2008, Magistrate Judge Guyton entered a memorandum and order. [Doc. No. 80]. The plaintiffs' motions [Doc. Nos. 71, 72] were denied. Magistrate Judge Guyton determined that the plaintiffs have not met their burden of showing good cause for an extension of the expired discovery deadline and for allowing the plaintiffs another extension of time to file a supplemental response to the summary judgment motion. The motion by McClellan and Scott to stay further discovery pending the Court's decision on the question of qualified immunity [Doc. No. 74] was granted. As the Magistrate Judge correctly explains, the stay of further discovery is consistent with applicable legal precedent and with the Court's previous orders in this case. The amended scheduling order [Doc. No. 52] provides the deadline for completing all discovery was December 3, 2007. When the Magistrate Judge entered his memorandum and order on February 12, 2008, the deadline for completing discovery (December 3, 2007) had already expired.

Plaintiffs' counsel Moncier indicated it was his belief that plaintiffs had not received initial disclosures from the defendants pursuant to Fed. R. Civ. P. 26(a)(1), and the parties had not held a discovery planning conference pursuant to Fed. R. Civ. P. 26(f). Magistrate Judge Guyton ordered the parties to meet and confer within 20 days to ensure that they were in compliance with Fed. R. Civ. P. 26. The trial scheduled for March 4, 2008, was cancelled by Magistrate Judge Guyton and continued to March 10, 2009. The undersigned District Judge authorized Magistrate Judge Guyton to continue and reschedule the trial.

In the wake of this Court's recent memorandum opinions and orders entered on January 27, 2009 [Doc. No. 117] and March 5, 2009 [Doc. No. 123], it is not necessary to address the question whether defendants McClellan and Scott are entitled to qualified immunity. The Tennessee state

law claims against McClellan and Scott have been dismissed without prejudice, and there are no federal claims against them under 42 U.S.C. § 1983. At this juncture there are no federal or state law claims pending in this case against defendants McClellan and Scott. The joint motion by McClellan and Scott for summary judgment [Doc. No. 38] is being denied as moot.

IV. **Plaintiffs' Objections to Magistrate Judge's February 12, 2008 Memorandum and Order [Doc. No. 81]; Plaintiffs' Supplemental Motion to Modify Magistrate Judge's February 12, 2008 Memorandum and Order [Doc. No. 86]**

Plaintiffs object to the Magistrate Judge's February 12, 2008, memorandum and order [Doc. No. 80]. Plaintiffs raised initial objections [Doc. No. 81], and later supplemented their objections. [Doc. Nos. 86, 94]. Plaintiffs move the District Judge to reconsider and modify or set aside the Magistrate Judge's February 12, 2008, memorandum and order.

Defendants McClellan, Scott, and Campbell County oppose the plaintiffs' objections. [Doc. Nos. 82, 87, 99]. Although the Court recently dismissed all of the plaintiffs' Tennessee state law claims, the plaintiffs' federal civil rights claims against Campbell County under 42 U.S.C. § 1983 remain before this Court for adjudication.

The District Judge may reconsider and modify or set aside any part of the Magistrate Judge's order that is determined to be clearly erroneous or contrary to law. 28 U.S.C. § 636(b)(1)(A); Fed. R. Civ. P. 72(a). The District Judge has reviewed the record *de novo* and considered the plaintiffs' objections. The District Judge concludes that the plaintiffs' objections are without merit and are **DENIED**. The Magistrate Judge's February 12, 2008, memorandum and order [Doc. No. 80] is not clearly erroneous or contrary to law. The Magistrate Judge's memorandum and order is correct, and there is no good reason to modify or set aside any part of it. To facilitate analysis of the plaintiffs'

10

objections, the Court will breakdown and review the objections in three parts based on the plaintiffs' first objections [Doc. No. 81] and the two supplements [Doc. Nos. 86, 94].

### A.    <u>Plaintiffs' Initial Objections [Doc. No. 81]</u>

In their initial objections [Doc. No. 81], plaintiffs mistakenly cite Rule 59(a) of the Federal Rules of Criminal Procedure. Fed. R. Crim. P. 59(a) is a rule of criminal procedure, and it is not applicable in this civil action. This case is governed by the Federal Rules of Civil Procedure.

McClellan, Scott, and Campbell County oppose the objections. The objections raised by the plaintiffs are not persuasive. For the reasons expressed by the defendants in their response [Doc. No. 82], the plaintiffs' objections [Doc. No. 81] are **DENIED**. The Court adds the following.

Plaintiffs cite Fed. R. Civ. P. 1 which provides that the Federal Rules of Civil Procedure "should be construed and administered to secure the just, speedy, and inexpensive determination of every action and proceeding." Plaintiffs contend that Fed. R. Civ. P. 1 and 16 justify modifying and setting aside the Magistrate Judge's order to stay further discovery.

This argument fails. The language in Fed. R. Civ. P. 1 cuts both ways. All parties before this Court, including the defendants, are entitled to have the Federal Rules of Civil Procedure "construed and administered to secure the just, speedy, and inexpensive determination" of the instant case. The record shows that the District Judge and Magistrate Judge Guyton have construed, administered, and enforced the Federal Rules of Civil Procedure in this case to secure a just, speedy, and inexpensive determination of the litigation for all parties. The Court entered scheduling orders pursuant to Fed. R. Civ. P. 16 and plaintiffs were afforded more than sufficient time to take full discovery. Defendants have an equal right to expect that their summary judgment motion be resolved in a just, speedy, and inexpensive manner.

11

When defendants McClellan, Scott, and Campbell County filed their summary judgment motion, plaintiffs requested and received a total of four extensions of time between June and early November, 2007, to file a response. Plaintiffs have no valid basis to complain that the Court has somehow failed to accommodate them. The record shows that it is the plaintiffs who are responsible for impeding the just, speedy, and inexpensive adjudication of this case by failing to comply with the Court's scheduling orders and failing to take more discovery when they had the opportunity to do so. The plaintiffs' myriad of reasons and excuses why they and their counsel, Farley and Anderson, failed or neglected to take timely discovery are insufficient to warrant granting them relief from the amended scheduling order under Fed. R. Civ. P. 56(f) and 60(b)(1) and (6).

Next, plaintiffs contend that discovery under the first scheduling order entered by District Judge Jarvis [Doc. No. 29], allows the parties to take discovery up to 90 days prior to trial. Plaintiffs argue that Magistrate Judge Guyton's order continuing the trial until March 9, 2009, has in effect created a new, revised discovery deadline and extends the deadline for discovery up to 90 days prior to the trial date of March 9, 2009.

This argument is frivolous. The first scheduling order was entered by District Judge Jarvis on October 4, 2006. [Doc. No. 29]. The case was later reassigned to District Judge Edgar. On July 16, 2007, District Judge Edgar entered an amended scheduling order [Doc. No. 52] which provides that December 3, 2007, is the deadline for completing all discovery, including the taking of depositions "for evidence." The first paragraph of the July 16, 2007 amended scheduling order states that it amends and supercedes the first scheduling order. It crystal clear that the deadline for discovery is December 3, 2007.

Next, plaintiffs argue it is error for the Magistrate Judge to grant the motion [Doc. No. 74]

12

to stay further discovery pending the Court's decision on the question of qualified immunity. The issue of qualified immunity and the motion by defendants McClellan and Scott to stay further discovery [Doc. No. 74] are now moot. In any event, the Court concludes that the Magistrate Judge's order was correct when entered. The stay of further discovery is consistent with the amended scheduling order [Doc. No. 52] which provides that December 3, 2007, is the deadline for completing discovery. When the Magistrate Judge entered February 12, 2008, order granting the defendants' motion to stay discovery, the discovery deadline had already expired.

The stay of further discovery ordered by the Magistrate Judge is reasonable and consistent with applicable legal precedent. Qualified immunity is immunity from suit, not merely a defense against liability. *Kimble v. Hoso*, 439 F.3d 331, 334 (6th Cir. 2006). The purpose of a qualified immunity defense is not only protection of a defendant in his individual capacity from money damages, but also protection from the expense and rigors of litigation, including discovery. The purpose of qualified immunity would be defeated if a defendant is required to face advanced stages of litigation, such as discovery, before the qualified immunity question is addressed by the Court. *Anderson v. Creighton*, 483 U.S. 635, 646 (1987); *Harlow v. Fitzgerald*, 457 U.S. 800, 816 (1982) (until threshold qualified immunity question is resolved, discovery should not be allowed); *Kimble*, 439 F.3d at 334-36; *Summers v. Leis*, 368 F.3d 881, 886 (6th Cir. 2004); *Wallin v. Norman*, 317 F.3d 558, 563 (6th Cir. 2003); *Skousen v. Brighton High School*, 305 F.3d 520, 527 (6th Cir. 2002).

Generally, the defense of qualified immunity provides government officials with the right to avoid the burden of unnecessary pretrial discovery. *Behrens v. Pelletier*, 516 U.S. 299, 314 (1996); *Collins v. Village of New Vienna*, 29 Fed. Appx. 359, 360-61 (6th Cir. 2002). The Supreme Court in *Crawford-El v. Britton*, 523 U.S. 574 (1998), stated that when a plaintiff brings a complaint

13

against a public official and makes a claim that requires proof of a wrongful motive, "the trial court must exercise its discretion in a way that protects the substance of the qualified immunity defense." The trial court must exercise its discretion so that public officials are not subjected to unnecessary and burdensome discovery or trials. *Id.* at 597-98.

Plaintiffs had a lengthy period of time to complete discovery. The deadline for completing discovery expired on December 3, 2007. It was reasonable for the Magistrate Judge on February 12, 2008, to order a stay of further discovery beyond that deadline until the Court could decide the question of qualified immunity. The Magistrate Judge's order is not clearly erroneous or contrary to law. It is within the Court's discretion to stay additional discovery, beyond the established discovery deadline, for the purpose of deciding a qualified immunity defense. *Everson v. Leis*, 556 F.3d 484, 490-93 (6th Cir. 2009).

### B.      Plaintiffs' First Supplement to Objections  [Doc. No. 86]

Plaintiffs made a supplemental motion [Doc. No. 86] to modify the Magistrate Judge's February 12, 2008, memorandum and order. This motion supplements the plaintiffs' objections. Plaintiffs seek to bring to the Court's attention some events that occurred after the initial objections. Plaintiffs contend they need more discovery from defendants McClellan and Scott on their qualified immunity defense. Plaintiffs further contend the Court should order McClellan, Scott, and Campbell County to produce documents as initial disclosures pursuant to Fed. R. Civ. P. 26(a)(1).

Defendants McClellan, Scott, and Campbell County responded [Doc. No. 87] opposing the supplemental motion and objections. Plaintiffs replied. [Doc. No. 90]. After reviewing the record, the Court agrees with the defendants' response. For the reasons expressed by the defendants in their response [Doc. No. 87], the plaintiffs' supplemental motion [Doc. No. 86] is **DENIED**. The

objections and issues raised by the plaintiffs [Doc. Nos. 86, 90] are not persuasive. The plaintiffs' arguments are without merit, factually inaccurate and/or moot.

To the extent that plaintiffs contend they need more discovery to oppose the summary judgment motion by defendants McClellan and Scott, and more discovery on the question whether defendants McClellan and Scott are entitled to qualified immunity, the plaintiffs' supplemental motion [Doc. No. 86] is now moot. Moreover, as the defendants point out in a separate response [Doc. No. 99], plaintiffs have been able to effectively obtain discovery, including taking the depositions of McClellan and Scott, in the course of litigation in the concurrent, parallel case in the Campbell County Circuit Court.

## C.     Plaintiffs' Second Supplement to Objections  [Doc. No. 94]

On March 27, 2008, plaintiffs filed a second supplement [Doc. No. 94] in support of their objections to the Magistrate Judge's February 12, 2008, memorandum and order. Plaintiffs seek to bring to the Court's attention developments in the parallel litigation in the Campbell County Circuit Court. Plaintiffs again contend that they need more discovery in the instant case in federal court, especially with regard to the qualified immunity defense of defendants McClellan and Scott.

Defendants McClellan, Scott, and Campbell County oppose the second supplement. After reviewing the record, the Court agrees with the defendants' response. For the reasons expressed by the defendants in their response [Doc. No. 99], the plaintiffs' second supplement fails and does not change the Court's decision.

To the extent that plaintiffs contend they need more discovery to oppose the summary judgment motion by defendants McClellan and Scott, and more discovery on the question whether defendants McClellan and Scott are entitled to qualified immunity, these matters are now moot.

15

Plaintiffs have been able to effectively obtain discovery, including taking the depositions of defendants McClellan and Scott, during the course of the concurrent, parallel case in the Campbell County Circuit Court. All of the plaintiffs' Tennessee state law claims against defendants McClellan and Scott will be adjudicated in the concurrent, parallel case in the Campbell County Circuit Court.

In sum, the District Judge pursuant to Fed. R. Civ. P. 72(a) and 28 U.S.C. § 636(b)(1)(A) has reviewed the record *de novo* and considered all of the plaintiffs' objections to the Magistrate Judge's February 12, 2008, memorandum and order. The plaintiffs' objections are **DENIED**. The Magistrate Judge's memorandum and order [Doc. No. 80] is not clearly erroneous or contrary to law. The plaintiffs' motions [Doc. Nos. 71, 72] have been properly denied.


**V.** **Plaintiffs' Motion to Strike and Exclude Affidavits of Scott and McClellan or, Alternative Motion To Consider Sworn Deposition Testimony of Scott and McClellan on April 2, 2008 To Deny Summary Judgment [Doc. No. 97]**

When defendants Scott, McClellan, and Campbell County filed their joint summary judgment motion [Doc, No. 38], they submitted the supporting affidavits of Scott and McClellan. [Doc. Nos. 42-2, 42-3]. Plaintiffs responded to the summary judgment motion on November 15, 2007. [Doc. No. 67]. Defendants Scott, McClellan, and Campbell County replied [Doc. No. 69] and submitted a document that is supposed to be Scott's supplemental affidavit. [Doc. No. 69-2]. However, Scott's supplemental affidavit [Doc. No. 69-2] dated November 21, 2007, is defective – the jurat is incomplete since it omits the signature of the notary public.

On April 2, 2008, plaintiffs moved to strike and exclude the affidavits of Scott and McClellan. In the alternative, plaintiffs move this Court to take into consideration sworn testimony

16

of Scott and McClellan taken by deposition on April 2, 2008, during discovery in the parallel case in the Campbell County Circuit Court. [Doc. No. 97]. Plaintiffs contend the deposition testimony of Scott and McClellan contradicts and is inconsistent with the affidavits of Scott and McClellan.

After reviewing the record, the Court concludes that the plaintiffs' motion [Doc. No. 97] is **DENIED** for the following reasons and also for the reasons expressed by the defendants in their response. [Doc. No. 102].

One overriding concern is that the deadline for completing discovery in this federal case is December 3, 2007. After the discovery deadline expired, plaintiffs have taken other discovery in the parallel case in the Campbell County Circuit Court including the depositions of Scott and McClellan on April 2, 2008. Plaintiffs seek to circumvent the December 3, 2007, discovery deadline and the Magistrate Judge's order staying additional discovery. It is a violation of this Court's orders and a violation of the December 3, 3007, discovery deadline for the plaintiffs to attempt to interject into the record here new discovery recently obtained in the parallel case in the Campbell County Circuit Court. Plaintiffs cannot do so without this Court's permission which has not been granted. This problem infects and permeates the plaintiffs' arguments in their motion to strike and exclude the affidavits of Scott and McClellan. [Doc. No. 97]. This is one reason why the plaintiffs' motion must be denied but there are additional reasons.

A.    **Scott's First Affidavit [Doc. No. 42-3]**

On May 29, 2007, defendants Scott, McClellan, and Campbell County submitted the affidavits of Scott and McClellan. Scott's first affidavit [Doc. No. 42-3] was signed by Scott on May 25, 2007. Plaintiffs contend the Court should strike and exclude Scott's first affidavit from consideration for several reasons.

17

Plaintiffs assert that on April 2, 2008, they took Scott's discovery deposition in the parallel case in the Campbell County Circuit Court. Plaintiffs say that Scott in his deposition did not remember signing the first affidavit on May 25, 2007, he did not personally know the notary public who witnessed his signature, and he did not recall being sworn when the affidavit was signed.

The Court concludes this is an insufficient reason to strike and exclude Scott's first affidavit. It is immaterial whether Scott does not presently have an independent memory of signing the first affidavit and he did not know the notary public. It is not unusual with the passage of time for a party or witness to not remember all the particular details and events surrounding the execution of an affidavit or similar document, and to also not personally be acquainted with the notary public. This does not prove and establish that Scott's statements in his first affidavit are completely false and lack all credibility. The key issue is whether the substance of Scott's statements in his affidavit are true and accurate. Plaintiffs have not come forward with any probative facts and relevant proof showing that Scott's statements in his first affidavit are materially false and inaccurate.

Next, plaintiffs argue the Court should strike and exclude Scott's entire first affidavit because Scott gave some testimony in his deposition on April 2, 2008, that is inconsistent with McClellan's deposition testimony on a couple of points. Plaintiffs offer to furnish this Court with excerpts from the depositions of Scott and McClellan taken on April 2, 2008, in the parallel state court case after the transcripts are prepared. The Court finds that plaintiffs have not demonstrated a sufficient reason to strike and exclude Scott's first affidavit. This is nothing more than an improper attempt by the plaintiffs to circumvent and evade this Court's order setting December 3, 2007, as the discovery deadline in this case. Moreover, the alleged inconsistencies and contradictions in the depositions of Scott and McClellan are immaterial and do not impact the Court's decision on Campbell County's

18

motion for summary judgment on the plaintiffs' remaining federal civil rights claims.

Next, plaintiffs argue that the Court should strike and exclude Scott's first affidavit on the ground that Scott gave some testimony in his deposition on April 2, 2008, that allegedly contradicts and is inconsistent with his first affidavit. Plaintiffs assert that during his deposition on April 2, 2008, Scott was questioned about what occurred after Lester Eugene Siler had been arrested and taken to the CCSD. In the presence of Scott and McClellan, Mr. Siler indicated he was injured and had been physically mistreated by sheriff's deputies. According to the plaintiffs, Scott testified to the following at his deposition. Scott did not believe Mr. Siler's statement that he was injured and that deputies had attached battery cables to his nose because Scott thought Mr. Siler was "high on drugs, hallucinating, and out of his mind." Plaintiffs argue that Scott's deposition testimony on this point contradicts and is inconsistent with Scott's first affidavit.

This argument fails. Scott states the following in paragraph 7 on page 3 of his first affidavit [Doc. No. 42-3]:

> Later that day I saw on a monitor that Deputies were bringing Siler into the Jail. I went with Sheriff McClellan to see Siler. **Siler appeared from his speech and physical appearance to be on drugs. He was talking up a storm, and slurring his words such that I could not understand much of what he said. However, what I heard sounded like bizarre stories.** I recall in particular Siler saying that Deputies had done something to him with battery cables. Siler complained that his side was hurting. The Sheriff [McClellan] asked Siler to raise his shirt, which Siler did. I saw no visible injury. I thought Siler was making up implausible stories to deflect from the fact that he had been arrested on serious felony drug charges. (Emphasis supplied).

These statements by Scott in his first affidavit are consistent with and do not contradict Scott's alleged deposition testimony. Assuming *arguendo* Scott testified in his deposition that one reason he did not believe Mr. Siler is because Scott thought Mr. Siler was "high on drugs, hallucinating,

19

and out of his mind," such deposition testimony by Scott would be consistent with and does not contradict the above quoted text from page 3, paragraph 7 of Scott's first affidavit.

Plaintiffs also makes a vague, conclusory argument that Scott's first affidavit does not qualify as an affidavit under Tennessee law. Plaintiffs do not explain the precise basis for this argument, except that Scott may not remember signing the first affidavit and Scott did not personally know the notary public. This argument is frivolous. The Court finds that Scott's first affidavit qualifies as a valid sworn affidavit and it may be considered by this Court in reviewing Campbell County's summary judgment motion under Fed. R. Civ. P. 56. Scott's first affidavit is signed by him, sworn to, and properly notarized.

Accordingly, the plaintiffs' motion [Doc. No. 97] to strike and exclude Scott's first affidavit [Doc. No. 42-3] is **DENIED**.

**B.**     **Scott's Second Affidavit and Supplemental Affidavit  [Doc. Nos. 69-2, 102-1]**

On November 26, 2007, defendants Scott, McClellan, and Campbell County filed Scott's second affidavit [Doc. No. 69-2] which is dated as being executed by Scott on November 21, 2007. Plaintiffs move to strike and exclude this affidavit because it is deficient on its face and does not qualify as a sworn affidavit. The jurat is incomplete since it omits the signature of the notary public. The objection is well taken but the problem has been resolved.

To correct this deficiency, defendants submit a new, corrected supplemental affidavit executed by Scott on April 10, 2008. [Doc. No. 102-1]. It is properly notarized and qualifies as a sworn affidavit for purposes of Fed. R. Civ. P. 56. The corrected supplemental affidavit [Doc. No. 102-1] replaces and cures the deficiency in Scott's second affidavit [Doc. No. 69-2]. Therefore, the plaintiff's motion [Doc. No. 97] to strike and exclude Scott's second affidavit [Doc. No. 69-2] is

20

**DENIED** as moot.

When reviewing the record and deciding defendant Campbell County's pending motion for summary judgment [Doc. No. 38] to dismiss the plaintiffs' remaining 42 U.S.C. § 1983 federal civil rights claims, the Court will consider Scott's first affidavit and Scott's corrected supplemental affidavit [Doc. Nos. 42-3, 102-1]. The Court excludes and does not consider Scott's defective second affidavit. [Doc. No. 69-2].

C. **McClellan's Affidavit Dated May 24, 2007 [Doc. No. 42-2]**

Plaintiffs seek to take an isolated excerpt out of context from McClellan's affidavit [Doc. No. 42-2] and stretch it beyond its reasonable boundaries in an effort to create a factual dispute and challenge McClellan's credibility. Plaintiffs focus their attention on page 2, paragraph 3 of McClellan's affidavit which states in part: "Since I was not aware before the fact that the Deputies were carrying out an active investigation of Siler, I was not aware of who Detective Webber presumably recruited to assist him."

The Court has reviewed McClellan's entire affidavit [Doc. No. 42-2] and this excerpt must be viewed in its proper context. The incident in dispute that forms the primary basis for this lawsuit occurred on July 8, 2004, when a group of five deputies led by Detective Webber went to the residence of Lester and Jenny Siler. Plaintiffs claim that on July 8, 2004, the five deputies held Lester Siler captive for an extended period of time during which Mr. Siler was subjected to various illegal acts of threats, intimidation, and physical and mental torture. The five deputies sought to force Mr. Siler to sign a form consenting to a search of his residence. Lester and Jenny Siler were falsely arrested without probable cause and maliciously prosecuted on false criminal charges.

An objectively reasonable person reading McClellan's entire affidavit would reach the

following conclusion. McClellan's affidavit states that with regard to the events on July 8, 2004, McClellan had no prior knowledge the five deputies were going to the Siler residence on July 8, 2004. It was only after the five deputies had already left to go to the Siler residence on July 8, 2004, that McClellan became aware of it. A fair reading of the affidavit is McClellan says that on July 8, 2004, he was not aware and had no prior personal knowledge of the deputies that Detective Webber recruited to accompany Detective Webber in going to the Siler residence.

Plaintiffs contend that during McClellan's deposition on April 2, 2008, in the parallel litigation in the Campbell County Circuit Court, McClellan allegedly gave testimony that contradicts and is inconsistent with the above quoted excerpt from his affidavit. Plaintiffs assert that during the deposition, Sheriff McClellan testified that **prior to the incident on July 8, 2004**: (1) McClellan on multiple occasions instructed Detective Webber to "get" Lester Eugene Siler; and (2) McClellan on multiple occasions discussed "getting Siler" with Scott.

For the sake of discussion, the Court assumes *arguendo* McCllellan testified in a deposition that prior to July 8, 2004, McClellan on multiple occasions gave general instructions to Detective Webber to investigate or "get" Mr. Siler, and further that McClellan on multiple occasions discussed investigating Siler with Scott. The Court is not persuaded that McClellan's alleged deposition testimony about conversations occurring prior to July 8, 2004, contradict his affidavit about McClellan's lack of personal knowledge about the actions taken by the five deputies against Mr. Siler on July 8, 2004. Plaintiffs fail to establish a sufficient reason to strike and exclude McClellan's affidavit. Plaintiffs have not demonstrated that McClellan's affidavit is false. The plaintiffs' motion [Doc. No. 97] to strike and exclude McClellan's affidavit is **DENIED**.

**VI.**     **Plaintiff's Motion to File Additional Evidence in Opposition to Defendants Campbell**

**County, McClellan, and Scott's Motions for Summary Judgment [Doc. No. 93];**

**Plaintiffs' Appeal and Objections to Magistrate Judge's Order Denying Motion**

**Plaintiffs' Motion to File Supplemental Evidence  [Doc. No. 105]**

Plaintiffs moved for leave to file additional evidence in opposition to the summary judgment motion of defendants Scott, McClellan, and Campbell County. [Doc. No. 93].  The proposed additional evidence includes:

(1)     A 40-minute audio recording of the events at the Silers' residence on July 8, 2004;

(2)     Admissions of defendant Franklin in the parallel civil case in the Campbell County Circuit Court;

(3)     Answers to interrogatories by defendant Franklin in the parallel civil case in the Campbell County Circuit Court;

(4)     Excerpt from transcript of defendant Webber's guilty plea in his federal criminal case on February 22, 2005;

(5)     Excerpt from transcript of defendant Webber's sentencing hearing in his federal criminal case on July 13, 2005;

(6)     Excerpt from transcript of defendant Franklin's guilty plea in his federal criminal case on February 23, 2005;

(7)     Excerpt from transcript of defendant Franklin's sentencing hearing in his federal criminal case on July 13, 2005;

(8)     Excerpt from transcript of defendant Green's guilty plea in his federal criminal case on February 24, 2005;

(9)     Excerpt from transcript of defendant Green's sentencing hearing in his federal

23

criminal case on July 13, 2005;

(10)    Excerpt from transcript of defendant Carroll's guilty plea in his federal criminal case on May 23, 2005; and

(11)    Excerpt from transcript of defendant Carroll's sentencing hearing in his federal criminal case on July 13, 2005.

Defendants opposed the motion. [Doc. No. 100]. On April 10, 2008, Magistrate Judge Guyton denied the plaintiffs' motion for leave to file additional evidence. [Doc. No. 101].

Plaintiffs object to and appeal from the Magistrate Judge's order. [Doc. No. 105]. After reviewing the record *de novo*, the Court concludes that the Magistrate Judge's April 10, 2008, order [Doc. No. 101] is correct, and it is not clearly erroneous or contrary to law. Pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(a) the plaintiffs' objection and appeal from the Magistrate Judge's order [Doc. No. 105] is **DENIED**.

Plaintiffs contend the Magistrate Judge lacks jurisdiction under 28 U.S.C. § 636(b)(1)(A) to decide their motion [Doc. No. 93] for leave to file additional evidence. Plaintiffs argue the District Judge has exclusive jurisdiction to decide what evidence will be considered in ruling on a summary judgment motion.

Based on the circumstances in this case, the plaintiffs' objection fails. The plaintiffs' motion for leave to file additional evidence beyond the discovery deadline set by the District Judge falls into the category of a nondispositive motion, and the Magistrate Judge has jurisdiction and authority under 28 U.S.C. § 636(b)(1)(A) to rule on such nondispositive motions. 28 U.S.C. § 636(b)(1)(A) provides that a District Judge may not designate a Magistrate Judge hear and determine a summary

judgment motion on the merits. But in the instant case the Magistrate Judge did not decide the summary judgment motion. The Magistrate Judge did not exceed the limits of his jurisdiction and authority under 28 U.S.C. § 636(b)(1)(A). Instead, the Magistrate Judge merely ruled on the plaintiffs' nondispositive motion for leave to file additional evidence after the discovery deadline set by the District Judge had expired and after the Magistrate Judge had ordered that further discovery was stayed. The Magistrate Judge's order is consistent with the District Judge's scheduling order setting the discovery deadline. The Magistrate Judge correctly enforced the discovery deadline set forth in the District Judge's scheduling order.

In any event, the Court after *de novo* review of the record further concludes that, for the reasons expressed by defendants in their response [Doc. No. 100], the plaintiffs motion [Doc. No. 93] for leave to file additional evidence is **DENIED**.

Plaintiff cannot show that the "additional evidence" was previously unavailable to them despite the exercise of due diligence. If plaintiffs and their counsel had exercised due diligence and taken reasonable steps to conduct an investigation and pretrial discovery, plaintiffs could have readily obtained all of this proposed additional evidence and timely presented it to this Court in response to the defendants' summary judgment motion and prior to the December 3, 2007 discovery deadline. Plaintiffs failed and neglected to do so.

Beyond the plaintiffs' lack of due diligence, all of the plaintiffs' claims against defendants Scott and McClellan have been dismissed without prejudice. At the present time there are no claims pending in this case against defendants Scott and McClellan. The motion by defendants Scott and McClellan for summary judgment [Doc. No. 38] is being denied as moot. To the extent that plaintiffs seek permission to present additional evidence for the purpose of opposing the motion for

25

summary judgment by defendants Scott and McClellan, the plaintiffs' motion to file additional evidence [Doc. No. 97] is likewise moot.

Only Campbell County's motion for summary judgment [Doc. No. 38] to dismiss the plaintiffs' 42 U.S.C. § 1983 federal civil rights claims remains before this Court for adjudication. Campbell County does not dispute the plaintiffs' allegations that deputies Webber, Franklin, Monday, Green, and Carroll violated the plaintiffs' federal civil rights. There is no dispute about the facts of what occurred at the Siler family residence on July 8, 2004. The question presently before this Court is whether the plaintiffs can prove that Campbell County is liable under 42 U.S.C. § 1983. The plaintiffs' first item of additional evidence – the 40-minute audio recording of the events at the Siler residence on July 8, 2004 – is immaterial to Campbell County's summary judgment motion. The Court's decision on Campbell County's summary judgment motion does not turn on the undisputed facts concerning the conduct of the five deputies at the Siler residence on July 8, 2004.

The Court agrees with the defendants' response [Doc. No. 100] that the rest of the plaintiffs' proposed additional "evidence" (items 2- 11) are not admissible evidence against Campbell County under the Federal Rules of Evidence and the Fed. R. Civ. P. 56 summary judgment rule. The unsworn discovery responses and admissions of defendant Franklin filed in the parallel case in the Campbell County Circuit Court are not admissible evidence here against Campbell County. *Lundquist v. United States*, 116 F.3d 1486 (Table, text in 1997 WL 355933, * 3 (9th Cir. June 27, 1997)); *Riberglass, Inc. v. Techni-Glass Industries, Inc.*, 811 F.2d 565 (11th Cir. 1987); *Alipour v. State Automobile Mut. Ins. Co.*, 131 F.R.D. 213, 214 (N.D. Ga. 1990); 8A Wright & Miller, Federal Practice and Procedure: Civil § 2264.

26

The excerpts from transcripts of guilty pleas and sentencing hearings in the federal criminal cases of defendants Webber, Franklin, Green, and Carroll are not admissible evidence against Campbell in the instant civil case. The transcripts contain hearsay, unsworn statements, oral argument by criminal defense counsel, and comments by the presiding judge which are not evidence that can be considered by this Court under Fed. R. Civ. P. 56 in reviewing Campbell County's summary judgment motion.

Accordingly, the plaintiffs motion for leave to file additional evidence [Doc. No. 93] is **DENIED**. The Magistrate Judge's April 10, 2008, order [Doc. No. 101] is not clearly erroneous or contrary to law. Pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(a) the plaintiffs' objection and appeal from the Magistrate Judge's order [Doc. No. 105] is **DENIED**.

## VII. Defendant Campbell County's Motion for Summary Judgment on Federal Civil Rights Claims Under 42 U.S.C. § 1983 [Doc. No. 38]

### A. Standard of Review

Summary judgment is appropriate where there is no genuine issue of material fact in dispute and the moving party is entitled to judgment as a mater of law. *Van Gorder v. Grand Trunk Western Railroad, Inc*., 509 F.3d 265, 268 (6th Cir. 2007); Fed. R. Civ. P. 56(c). The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. The requirement is that there be no genuine issue of material fact. *Anderson v. Liberty Lobby*, 477 U.S. 242, 247-48 (1986).

As to materiality, the applicable substantive law will identify and determine which facts are material. *Id*. at 248. Only disputes over facts that might affect the outcome of the case under the governing substantive law will properly preclude the Court from granting summary judgment.

27

Factual disputes that are irrelevant or unnecessary cannot preclude summary judgment. *Id*. Summary judgment will not lie if the dispute about a material fact is "genuine," that is, if the evidence is such that an objectively reasonable jury at trial could return a verdict in favor of the non-moving party. *Id*.

As the moving party, defendant Campbell County bears the initial burden of demonstrating that no genuine issues of material fact exist. Campbell County may satisfy this burden either by presenting affirmative evidence that negates an essential element of the plaintiffs' claim, or by demonstrating the absence of evidence to support a claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 325 (1986); *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003).

Once Campbell County meets this initial burden, plaintiffs are not entitled to a trial on the basis of mere allegations. To defeat a summary judgment motion, plaintiffs are required to come forward with some significant probative evidence and specific facts to support their claims and show that a trial is necessary to resolve a genuine issue of material fact in dispute. *Celotex Corp.*, 477 U.S. at 322; *Anderson*, 477 U.S. at 249; *Van Gorder*, 509 F.3d at 268; *Rodgers*, 344 F.3d at 595. A mere scintilla of evidence is not enough. *Anderson*, 477 U.S. at 252; *Van Gorder*, 509 F.3d at 268; *McLean v. Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000); *Hartsell v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996); *Mitchell v. Toledo Hospital*, 964 F.2d 577, 581-82 (6th Cir. 1992).

The entry of summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322-23; *see also Van Gorder*, 509 F.3d at 268; *Collyer v. Darling*, 98 F.3d 211, 220 (6th Cir. 1996); *Hartsell*, 87 F.3d at 799. Because plaintiffs bear the burden of proving their 42 U.S.C. § 1983 federal civil rights claims

28

at trial, they must present facts and evidence showing there is a genuine issue for a jury to decide at trial as to each essential element of their case. *Van Gorder*, 509 F.3d at 268; *Hartsell*, 87 F.3d at 799 (citing *Celotex Corp.*, 477 U.S. at 322).

The Court's role under Rule 56 is limited to determining whether the record contains sufficient facts and admissible evidence from which a rational jury could reasonably find in favor of the plaintiffs. *Anderson*, 477 U.S. at 248; *Rodgers*, 344 F.3d at 595; *National Satellite Sports, Inc. v. Eliadis, Inc*., 253 F.3d 900, 907 (6th Cir. 2001). The Court views the facts in the record and all reasonable inferences that can be drawn from those facts in the light most favorable to the plaintiffs. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986); *Van Gorder*, 509 F.3d at 268; *National Satellite Sports*, 253 F.3d at 907. The Court cannot weigh the evidence, judge credibility of witnesses, or determine the truth of matters in dispute. *Anderson*, 477 U.S. at 249.

### B. Objections to Plaintiffs' Exhibits

Campbell County objects [Doc. No. 69] to certain exhibits that the plaintiffs have attached to their response to the summary judgment motion. [Doc. No. 67]. Campbell County contends the exhibits should not be taken into consideration by the Court.

Under Fed. R. Civ. P. 56, the evidence proffered by a party need not be in a form that would be admissible at trial. *Celotex Corp.*, 477 U.S. at 324; *Weinberger v. Grimes*, 2009 WL 331632, * 6 (6th Cir. Feb. 10, 2009); *Tinsley v. General Motors Corp*., 227 F.3d 700, 703 (6th Cir. 2000). Affidavits must be made on personal knowledge and set out facts that would be admissible in evidence at trial under the Federal Rules of Evidence. Fed. R. Civ. P. 56(e)(1); *Weinberger*, 2009 WL 331632, at * 6; *Alpert v. United States*, 481 F.3d 404, 409 (6th Cir. 2007). Hearsay may not be

29

considered under Rule 56. *Weinberger*, 2009 WL 331632, at * 6; *Tinsley*, 227 F.3d at 703; *Wiley v. United States*, 20 F.3d 222, 224 (6th Cir. 1994).

Plaintiffs' exhibits 1, 2, and 10 [Doc. Nos. 67-1, 67-2, 67-9] are newspaper articles. Plaintiffs offer the newspaper articles for the truth of what is stated therein. The newspaper articles set forth what are reported to be verbatim quotes of statements made by various persons including McClellan. The newspaper articles are not appended to a sworn affidavit based on personal knowledge that verifies and corroborates their accuracy.

Campbell County objects and argues that the newspaper articles should be excluded on the ground they are hearsay and do not constitute admissible evidence under Fed. R. Evid. 802 and 803. The objection is well taken and granted. The Court agrees with Campbell County that the newspaper articles are hearsay and do not constitute competent evidence for purposes of summary judgment under Fed. R. Civ. P. 56. *Cano v. Bexar County, Texas*, 280 Fed. Appx. 404, 406 (5th Cir. 2008); *Turner v. City of Taylor,* 412 F.3d 629, 652 (6th Cir. 2005); *Roberts v. City of Shreveport*, 397 F.3d 287, 295 (5th Cir. 2005); *Neal v. Bolton*, 2008 WL 5156685, * 12-13 n. 3 (N.D. Fla. Dec. 9, 2008); *Gailor v. Armstrong*, 187 F. Supp.2d 729, 734 (W.D. Ky. 2001); *Smith v. Village of Garden City*, 592 F. Supp. 637, 639 (E.D.N.Y. 1984); *De La Cruz v. DuFresne*, 533 F. Supp. 145, 149 (D. Nev. 1982). The Court excludes and will not consider the newspaper articles.

Campbell County objects to plaintiffs' exhibit 3 [Doc. No. 67-3], the affidavit of Jackie Miracle. The objection is denied. Jackie Miracle's affidavit is based on his personal knowledge and may be taken into consideration.

Campbell County objects to plaintiffs' exhibit 14 [Doc. No. 67-12], a copy of a document filed in the Criminal Court of Campbell County on June 30, 1992. It is a waiver of trial by jury and

request for acceptance of guilty plea executed by Paul Brian Sammons (Sammons) on charges of aggravated burglary and theft of property over $1,000. Plaintiffs contend that Sammons, a convicted felon, was employed as a "reserve deputy" by the CCSD. [Doc. No. 67, p. 8]. Plaintiffs seek to use Sammons as an example of the CSSD's alleged deliberate indifference by having a relaxed employment screening process and hiring deputies who have prior criminal convictions.

In his supplemental affidavit [Doc. No. 102-1], Scott explains that Sammons was never hired as a deputy sheriff and never paid a salary by the CCSD. Many years after his conviction and after Sammons demonstrated that he had turned his life around, Sammons volunteered his time to assist the CCSD by installing protective screens, radios, emergency lights, and sirens on patrol cars. Sammons did not perform any law enforcement duties and he not a deputy sheriff. On a few occasions, Sammons was paid to remove and replace some engines in police cruisers. This mechanical work was done as contract labor and Sammons was paid for his services like any other vendor. Sammons was not involved in the incident involving the investigation and arrest of Lester Eugene Siler, Jenny Siler, and Dakota Siler on July 8, 2004.

Plaintiffs have not responded to the objection and do not dispute the accuracy of Scott's affidavit regarding Sammons' status and that Sammons was never employed by the CCSD as a deputy sheriff. The Court concludes that Campbell County's objection to plaintiff's exhibit 14 [Doc. No. 67-12] is well taken and granted. The Court excludes and will not consider plaintiff's exhibit 14 under Fed. R. Civ. P. 56. Since Sammons was never employed by the CCSD as a deputy sheriff, the document showing Sammons' guilty plea on June 30, 1992 is not relevant evidence in this case and is immaterial to the plaintiffs' complaint against Campbell County. The document is inadmissible as evidence under Fed. R. Civ. P. 401 and 402.

31

C.    <u>Facts</u>

The Court has reviewed the record in the light most favorable to the plaintiffs.  Webber, Franklin, Monday, Green, and Carroll were employed as deputy sheriffs by the CCSD.  On July 8, 2004, they went to the residence of Lester and Jenny Siler to serve Lester Siler with an arrest warrant for violation of probation.  Lester Siler was suspected of drug-trafficking.

The lead officer at the scene was Detective Webber.  Lester Siler was handcuffed, brought inside the home, and forced to sit in a chair.  The five deputies ordered Jenny Siler and her child, Dakota, to leave their home and wait outside.  The five deputies repeatedly threatened Lester Siler with severe bodily harm unless he cooperated by signing under duress a form consenting to a warrantless search of his residence.  The five deputies' conduct included threats to shoot and kill Lester Siler with a handgun, assault and beat him, burn him with a cigarette lighter, and break his fingers.  Monday placed a handgun in Lester Siler's mouth threatening to kill him.  Wires from a battery charger were attached to Lester Siler's body.  The five deputies threatened to electrocute Lester Siler or subject him to painful electrical shocks.  Webber encouraged Franklin, Monday, Green, and Carroll to slap, hit, punch, kick, and beat Lester Siler who was handcuffed and unable to resist.  In sum, the five deputies held Lester Siler captive for an extended period of time during which they subjected Mr. Siler to threats of serious bodily harm and possible death, intimidation, assault and battery, and beatings that amount to inhumane physical and mental torture.

Webber, Franklin, Monday, Green, and Carroll conspired to fabricate and make up a false story as a pretext to arrest Lester and Jenny Siler on false criminal charges.  After being arrested and transported to the Campbell County Jail, Lester and Jenny Siler were able to post bond and gain their release.  The false criminal charges against Lester and Jenny Siler were ultimately dismissed.

32

Many of the events inside the Siler residence on July 8, 2004, were secretly recorded on audiotape by Jenny Siler. The audiotape was furnished to the Tennessee Bureau of Investigation (TBI) which undertook an investigation. When McClellan was informed about the TBI investigation and he listened to the audiotape, McClellan promptly took action on July 19, 2004, to terminate the employment of deputies Webber, Franklin, Monday, Green, and Carroll with the CCSD.

The United States Attorney in Knoxville, Tennessee, brought criminal charges against the five deputies. Webber, Franklin, Green, and Carroll pleaded guilty, and they were convicted and sentenced to imprisonment for conspiracy against federal civil rights in violation of 18 U.S.C. § 241. Monday pleaded guilty, and he was convicted and sentenced to imprisonment on a charge of brandishing a firearm during and in relation to a crime of violence in violation of 18 U.S.C. § 924(c).

Plaintiffs contend Campbell County is liable under 42 U.S.C. § 1983 on two theories: (1) failure to adequately train or supervise deputy sheriffs; and (2) failure to screen the background of persons employed as deputy sheriffs.

In an effort to make out viable 42 U.S.C. § 1983 claims against Campbell County, plaintiffs make the following allegations. It is alleged that Sheriff McClellan and Chief Deputy Sheriff Scott failed to adequately train and supervise deputies Webber, Franklin, Monday, Green, and Carroll; and that McClellan and Scott thereby exhibited deliberate indifference to the constitutional rights of persons who came into contact with these five deputies. McClellan and Scott hired Monday, Green, and Carroll as deputies and allowed them to work as patrol officers knowing that Monday, Green, and Carroll were not adequately trained or supervised. Monday, Green, and Carroll had not attended the police training academy and were not certified with the Tennessee Peace Officer's Standards and Training Commission (POST), Tenn. Code Ann. §§ 38-8-104 - 38-8-207. It is alleged that

33

McClellan and Scott were aware and had knowledge of the propensity of Webber, Franklin, Monday, Green, and Carroll towards violence. Although McClellan and Scott were aware of prior incidents and complaints concerning Webber, Franklin, Monday, Green, and Carroll using excessive force, McClellan and Scott took no action to reprimand, discipline, train, and supervise these five deputies to correct or control their violent behavior. Deputies Webber, Franklin, Monday, Green, and Carroll were sent to the Siler residence on July 8, 2004, by McClellan and Scott. McClellan instructed his deputies to "get" Lester Siler and make Mr. Siler a "top priority."

The record, however, shows that plaintiffs have presented little or no probative, admissible evidence to support their factual allegations and theories of liability against Campbell County. Plaintiffs have difficulty overcoming and attacking the veracity of the affidavits of McClellan and Scott. Plaintiffs attach some exhibits to their response [Doc. No. 67] in an effort to create issues of fact to preclude summary judgment in favor of Campbell County but this effort fails.

There is no probative evidence that prior to July 8, 2004, McClellan and Scott had any knowledge of the propensity of Webber, Franklin, Monday, Green, and Carroll towards violence and use of excessive force. There is no evidence that prior to July 8, 2004, McClellan and Scott were aware of any similar incidents and complaints concerning Webber, Franklin, Monday, Green, and Carroll using excessive force or committing acts of violence against criminal suspects or citizens. There is no evidence that prior to July 8, 2004, it was ever necessary for McClellan and Scott to take action to reprimand, discipline, train, and supervise these five deputies to correct and control violent behavior or use of excessive force. There is no evidence that McClellan directed and instructed deputies Webber, Franklin, Monday, Green, and Carroll to use any unlawful means or excessive force "get" Lester Siler.

34

1.      **McClellan's Affidavit**

In his affidavit [Doc. No. 42-2], McClellan states the following. McClellan was Campbell County Sheriff for sixteen years from September 1998 - August 2006. During McClellan's term as Sheriff, it was the policy and practice in the CCD to respect the constitutional rights of individuals. When McClellan received complaints about a police officer's alleged misconduct that appeared to be serious, McClellan assigned a detective to investigate and report back to either McClellan or his chief deputy. McClellan did not ignore and fail to investigate complaints from citizens about potentially serious police misconduct.

Prior to July 8, 2004, McClellan was not aware of any information that would have led him to believe deputies Webber, Franklin, Monday, Green, and Carroll were capable of such violence and gross misconduct when investigating or arresting someone, including a person like Lester Siler who was suspected of drug trafficking. During McClellan's term as Sheriff, the extraordinary events that occurred at the Siler residence on July 8, 2004, was an unprecedented, "one-of-kind," isolated incident. McClellan terminated the employment of deputies Webber, Franklin, Monday, Green, and Carroll within a few hours after McClellan listened to the audiotape and learned the true facts of what the five deputies had done at the Siler residence on July 8, 2004.

Two of the deputies were veteran, experienced law enforcement officers. Webber was a narcotics detective and Franklin was a detective who had also served as a sergeant in the patrol division. In July 2004 and at all times material to this case, regular, full-time deputies employed by the CCSD were provided with standard law enforcement training in accordance with the Tennessee POST. Monday had recently been promoted from jail corrections officer to patrol officer. Although Monday was scheduled to go for the Tennessee POST training program at Walter State Community

35

College, Monday did not attend the training program before July 8, 2004. Carroll and Green had not been to the police training academy. Ordinarily, Carroll and Green would not have participated in or been assigned to a drug-trafficking investigation and arrest. Deputy Carroll's job was maintenance of the CCSD's fleet of police motor vehicles. Deputy Green only worked part time serving civil process. Carroll and Green were not assigned to duties as narcotics detectives and regular patrol officers.

Prior to July 8, 2004, McClellan was familiar with Lester Siler's reputation in the community as a drug trafficker. For several months McClellan received complaints from residents in the White Oak community in Campbell County about drug trafficking activities at Lester Siler's residence. Citizens were especially upset because the Siler residence was very close to an elementary school. McClellan periodically asked Detective Webber and a narcotics officer with the Eighth Judicial District Drug Task Force whether they were investigating citizen complaints about drug trafficking activity at the Siler residence. McClellan passed along his information to Detective Webber and the Task Force. When McClellan would occasionally make an inquiry about the status of the investigation of Lester Siler, Detective Webber and the Task Force narcotics officer typically replied that they were "working on it" without going into details. McClellan did not give any directives to Detective Webber or the other narcotics detectives to "get" Lester Siler through unlawful means. McClellan never thought that Detective Webber would "investigate" Lester Siler in the violent and illegal manner that occurred at the Siler residence on July 8, 2004.

On July 8, 2004, it was Detective Webber who made the decision to recruit Monday, Carroll, and Green to accompany Webber and Franklin in going to the Siler residence. Webber was the leader of the group of five deputies who went to the Siler residence. On July 8, 2004, Monday,

36

Green, and Carroll were under the supervision of Webber and Franklin who were the senior officers.

On July 8, 2004, McClellan had no prior knowledge that Webber, Franklin, Monday, Carroll, and Green were going to the Siler residence. McClellan was unaware of the other deputies recruited by Webber. Nonetheless, McClellan would have believed that he could trust veteran police officers such as Webber and Franklin to conduct lawful investigations and make arrests consistent with their experience and training as CCSD deputies, and consistent with the constitutional rights of citizens.

McClellan did not send deputies Webber, Franklin, Monday, Carroll, and Green to the Siler residence on July 8, 2004, with any directions or instructions from McClellan to "get" Lester Siler by any means, lawful or unlawful. The first knowledge McClellan had that deputies Webber, Franklin, Monday, Carroll, and Green were going to the Siler residence on July 8, 2004, was after the five deputies had already left the CCSD. Scott informed McClellan that the five deputies were going to serve papers on Lester Siler.

McClellan was at the CCSD on July 8, 2004, when the five deputies returned and brought Lester Siler to the Campbell County Jail under arrest. McClellan observed that Lester Siler appeared obviously intoxicated and stammering with slurred speech. Siler made, what seemed at the time, to be implausible allegations that the deputies had put battery cables on him. McClellan did not think that there could be any truth to such bizarre claims. McClellan never thought that veteran officers Webber and Franklin would have allowed misconduct by the subordinate deputies (Monday, Carroll, Green) remotely similar to the civil rights violations that occurred at the Siler residence, much less Webber and Franklin encouraging and participating in it.

McClellan observed no physical injury on Lester Siler at the Campbell County Jail on July 8, 2004. Since Lester Siler complained of physical injury, McClellan asked the nurse on duty to

examine Mr. Siler. The nurse conducted the examination and said she could not find anything wrong with Lester Siler, i.e. no physical injury. At that time, McClellan thought nothing more about Lester Siler's "stories" of mistreatment at the hands of the five deputies. Later, McClellan had a conversation with Franklin. McClellan told Franklin that Mr. Siler was claiming that the deputies did things to him like put battery cables on him. Franklin responded with plausible denials to the effect that, "Yeah, I would expect someone with charges like his to say anything."

Several days after July 8, 2004, McClellan learned there was a problem with the deputies' conduct involving Lester Siler. Scott advised McClellan that Scott had heard something bad about the five deputies who went to the Siler residence. Scott said that McClellan needed to listen to an audiotape in the possession of the TBI. McClellan and Scott went to the TBI office and listened to the audiotape made by Jenny Siler. McClellan promptly decided that the employment of deputies Webber, Franklin, Monday, Carroll, and Green with CCSD should be terminated without awaiting any further investigation or criminal indictment.

McClellan states the misconduct of the five deputies involving Lester Siler was clearly prohibited by CCSD policy, as written and in practice. No CCSD deputy could have reasonably believed that such misconduct, once discovered, would be condoned by McClellan. McClellan is unaware of any additional police training, policies, or supervision he could have had in place at the CCSD that would have affected (prevented) the aberrational events on July 8, 2004.

### 2. Scott's First Affidavit

Scott's affidavit is consistent with McClellan's affidavit. In his first affidavit [Doc. No. 42-3], Scott states the following.

Scott became Chief Deputy at the CCSD in January 2003. Prior to July 8, 2004, Scott had

no information or knowledge that any CCSD deputies had the intent or were capable of mistreating a criminal suspect like what happened to Lester Siler. During his 18 months of service as Chief Deputy prior to July 8, 2004, Scott was not aware of any information from complaints by citizens or his own personal observations that would have caused him to suspect that deputies Webber, Franklin, Monday, Carroll, and Green were capable of such misconduct. Scott did not encourage or condone behavior by CCSD deputies such as what occurred involving Lester Siler. The actions of deputies Webber, Franklin, Monday, Carroll, and Green on July 8, 2004, violated established CCSD policy, written and in practice, as Scott knew and implemented that policy in his capacity as Chief Deputy leading up to July 8, 2004.

On July 8, 2004, Scott talked with patrol deputy Monday. Monday informed Scott that deputies were going to the White Oak community to serve a warrant on Lester Siler. Scott did not know Lester Siler. Scott did not know that Lester Siler had been under investigation by narcotics detectives. Monday asked if Scott wanted to accompany the deputies to the Siler residence and Scott declined. Later that day, Scott informed McClellan what Monday had said about deputies going to serve a warrant on Lester Siler. McClellan seemed please to hear this news. McClellan said that he had received numerous complaints from citizens about drug trafficking at the Siler residence which was near an elementary school. Scott and McClellan had no inkling of the mistreatment that the five deputies would inflict on Lester Siler on July 8, 2004.

When the deputies brought Lester Siler to the Campbell County Jail under arrest, Scott went with McClellan to see Mr. Siler. Scott observed that Lester Siler, from his speech and physical appearance, appeared to be on drugs. Mr. Siler was "talking up a storm"and slurring his words such that Scott could not understand much of what Siler had to say. What Scott was able to understand

39

sounded like bizarre stories. Scott recalls Lester Siler saying that deputies had done something to him with battery cables. Siler complained his side was hurting. McClellan asked Lester Siler to raise up his shirt and Scott observed no visible physical injury on Siler's body. Scott assumed that Siler was fabricating implausible stories about police mistreatment to deflect attention from his arrest on criminal charges. McClellan asked the jail nurse to examine Lester Siler. Scott later heard that the nurse saw no visible physical injuries on Lester Siler.

A few days after July 8, 2004, Scott talked with Monday at the CCSD. Moday said that Lester Siler had made a complaint to the TBI and Monday was going to the TBI office to be interviewed. Monday did not seem nervous and did not ask Scott for any advice, so Scott was not overly concerned. Scott, a former TBI agent, advised Monday to tell the truth during the TBI interview. Scott continued to believe that Lester Siler was inventing tall tales of abuse perhaps as some perceived leverage concerning the felony criminal charges against him.

A few days after Monday's TBI interview, Scott received a telephone call from TBI agents who said there was something Scott needed to hear. Scott went to the TBI office where he listened to the audiotape of the events at the Siler residence on July 8, 2004. Scott informed McClellan about the audiotape. Scott went with McClellan to the TBI office so McClellan could listen to the audiotape for himself. McClellan and Scott agreed that Webber, Franklin, Monday, Carroll, and Green must be terminated from employment with the CCSD. On McClellan's instructions, Scott notified Webber, Franklin, Monday, Carroll, and Green their employment was terminated.

Although Scott was not training officer for the CCSD, Scott is generally familiar with the training of deputy sheriffs based on his 20 years of experience in law enforcement with TBI and the CCSD. In Scott's opinion, a police officer does not need particularized training to know that the

40

conduct engaged in by the five deputies at the Siler residence on July 8, 2004, is obviously improper and unlawful. The conduct of deputies Webber, Franklin, Monday, Carroll, and Green is inconsistent with any law enforcement training program that Scott is aware of, including the training in place at the CCSD based on Scott's experience as Chief Deputy Sheriff.

### 3. **Plaintiffs' Response**

In their response [Doc. No. 67], plaintiffs submit documents which show the following. Monday worked as a patrol deputy on three occasions in August and September, 2003. [Doc. No. 67-6]. Plaintiffs offer this to contradict in part McClellan's statement that prior to July 8, 2004, Monday had recently been promoted from jail corrections officer to patrol officer.

On March 15, 2004, Carroll was employed with the CCSD as a new, full-time uncertified deputy sheriff. [Doc. No. 67-7]. The Court infers that the term "uncertified" means that Carroll was not POST certified. Green worked as a patrol deputy on July 7, 2004. [Doc. No. 67-8]. Plaintiffs offer this to contradict McClellan's statement that prior to July 8, 2004, Deputy Green only worked part time serving civil process.

In support of its theory that Campbell County was deliberately indifferent to the constitutional rights of persons that its police officers might come into contact with, plaintiffs offer a few documents to show that the CCSD employed two deputies, Daniel S. Pedrin and Shayne Green, who had prior criminal records. Plaintiffs seek to show deliberate indifference on the part of Campbell County in that the CCSD did not implement and enforce an adequate employment screening process for evaluating and hiring deputies. As discussed *supra*, the Court has determined that Paul Brian Sammons does not fit into this category because plaintiffs have not presented any admissible evidence showing that Sammons was ever employed as a deputy sheriff by the CCSD.

41

Plaintiffs focus on Daniel Pedrin (Pedrin) and defendant Shayne Green. In September 1996, Pedrin was cited for a misdemeanor of operating a motor vehicle without a valid driver's license which is not a crime of violence. Pedrin was initially employed by the CCSD as a corrections deputy at the Campbell County Jail. On December 8, 2004, after the incident at the Siler residence on July 8, 2004, Pedrin was transferred from corrections officer to full-time patrol deputy. [Doc. No. 67-10].

Green was involved in three incidents. [Doc. No. 67-8]. First, in December 1997, Green was charged with one count of domestic violence by assault in the Campbell County General Sessions Court. A sergeant with the CCSD observed Green slap a woman in the face. The charge was ultimately dismissed in 1999 upon Green's payment of court costs and Green was not convicted.

Second, in April 1998, Kathy Green obtained a civil ex parte order of protection from the Campbell County General Sessions Court against Shayne Green. In the application for the protective order, Kathy Green alleged she was afraid for her safety because Shayne Green threatened to inflict bodily harm on her if he saw her with another man. In June 1998, the Campbell County General Sessions Court dismissed the ex parte order of protection on the ground that Kathy Green had failed to prove her allegation.

Third, in June 1998, Christy Bolton obtained a civil ex parte order of protection from the Campbell County General Sessions Court against Shayne Green. In the application for the protective order, Christy Bolton alleged she was afraid for her safety because Shayne Green threatened to kill or inflict bodily harm on her if she ever left. It was also alleged that Green threatened to destroy the car he bought for her. The record does not reflect whatever happened to this ex parte protective order and whether a hearing was ever held where Green could have an

42

opportunity to appear and explain his side of what happened.

Next, in support of its theory that Campbell County was deliberately indifferent to the constitutional rights of persons that its police officers might come into contact with, plaintiffs submit the affidavit of Jackie Miracle (Miracle). Miracle states that on an unspecified date in or about 2004, he was employed with the CCSD and riding with a CCSD deputy sheriff when they became involved in the pursuit of another vehicle containing a driver and passenger. After the other vehicle was stopped, Miracle and another deputy secured the passenger. Chief Deputy Scott was at the scene along with some other CCSD deputies. Miracle heard but did not see the driver of the pursued vehicle being abused by deputies. Miracle heard the driver of the pursued vehicle beg deputies to stop beating him. Miracle stayed with the passenger prisoner who was handcuffed. An unidentified officer with the CCSD came to the area where Miracle was located and physically abused the handcuffed passenger prisoner. The other unidentified officer jerked the passenger prisoner up by the hair on his head and began slapping him. Scott stood by and watched the handcuffed passenger prisoner being physically abused.

The Court finds that Miracle's affidavit has very little probative value. Miracle does not identify deputies Webber, Franklin, Monday, Carroll, and Green as being involved in this incident. Moreover, Miracle merely states that the incident occurred sometime in or about 2004. Miracle does not state whether the incident occurred before or after the events at the Siler residence on July 8, 2004. If the incident described in Miracle's affidavit occurred after the events at the Siler residence on July 8, 2004, then Miracle's affidavit is immaterial. This Court must focus on whether Campbell County had a policy or custom in effect on July 8, 2004, that caused the events at the Siler residence.

Miracle's affidavit is the only proof plaintiffs offer to show that on July 8, 2004, Campbell

County and the CCSD had a history and policy or custom of tolerating its police officers committing acts of physical abuse and violence against suspects under arrest. The one, isolated incident described in Miracle's affidavit, standing alone, is insufficient to establish a pattern of repeated conduct that amounts to a established policy or custom that could give rise to liability for Campbell County under 42 U.S.C. § 1983.

### 4.    Scott's Supplemental Affidavit

In his supplemental affidavit [Doc. No. 102-1], Scott states the following. With regard to Miracle's affidavit, Scott denies that he witnessed or observed any CCSD deputies commit acts of physical abuse against suspects under arrest.

On occasions when regular patrol deputies were absent and other regular patrol deputies were unavailable, it was necessary to assign a deputy from the corrections division fill in and work patrol duty. Prior to being transferred from the corrections division to the patrol division, Monday on some occasions filled in as a patrol officer when the CCSD was shorthanded on regular patrol officers. Deputies filling in for regular patrol officers would be expected to prepare the necessary, standard paperwork including arrest warrants. All deputies were expected to take out arrest warrants for persons who commit criminal offenses in the deputy's presence, regardless of their assignment to corrections, patrol, etc., and regardless of whether they worked full-time or part-time.

### D.    No *Respondeat Superior* Liability Under 42 U.S.C. § 1983; and Tenn. Code Ann. § 8-8-302 Not Applicable in 42 U.S.C. § 1983 Cases

The Ninth Count in the complaint pleads that Campbell County is being sued pursuant to Tenn. Code Ann. § 8-8-302 for constitutional torts committed by Webber, Franklin, Monday, Green, and Carroll which were done by virtue of and under color of their authority as Campbell County

44

Deputy Sheriffs. Tenn. Code Ann. § 8-8-302 provides: "Anyone incurring any wrong, injury, loss, damage or expense resulting from any act or failure to act on the part of any deputy appointed by the sheriff may bring suit against the county in which the sheriff serves; provided, that the deputy is, at the time of such occurrence, acting by virtue of or under color of the office."

Plaintiffs attempt to use Tenn. Code Ann. § 8-8-302 to impose liability on Campbell County on the federal civil rights claims brought under 42 U.S.C. § 1983. This the plaintiffs cannot do. Liability under 42 U.S.C. § 1983 is governed by federal law, not Tennessee state law. Tenn. Code Ann. § 8-8-302 does not broaden or expand the scope of 42 U.S.C. § 1983 liability. If Tenn. Code Ann. § 8-8-302 is applied to the 42 U.S.C. § 1983 claims against Campbell County, it would in effect allow vicarious liability to be imposed on Campbell County based on the doctrine of *respondeat superior* which is not permitted in 42 U.S.C. § 1983 cases. Tenn. Code Ann. § 8-8-302 is not applicable here and it cannot be a basis for imposing liability on Campbell County on the 42 U.S.C. § 1983 claims. *Henderson v. Reyda*, 2005 WL 1397030, ** 6-7 (E.D. Tenn. June 13, 2005), *aff'd*, 192 Fed. Appx. 392 (6th Cir. 2006); *Seiber v. Cooper*, 522 F. Supp. 157, (E.D. Tenn. 1981).

Campbell County cannot be held liable pursuant to 42 U.S.C. § 1983 solely on the basis that an injury has been inflicted on the plaintiffs by a deputy sheriff employed by the CCSD. Campbell County cannot be vicariously held liable under 42 U.S.C. § 1983 based on the doctrine of *respondeat superior* for constitutional torts committed by its employees. There is no *respondeat superior* liability under § 1983 for governmental entities. *Board of County Comm'rs of Bryan County v. Brown*, 520 U.S. 387, 403 (1997); *Collins v. Harker Heights*, 503 U.S. 115, 121 (1992); *Monell v. New York Department of Social Services*, 436 U.S. 658, 694 (1978); *Gregory v. City of Louisville*, 444 F.3d 725, 752 (6th Cir. 2006); *Gregory v. Shelby County, Tennessee*, 220 F.3d 433, 441 (6th

45

Cir. 2000); *Doe v. Claiborne County, Tennessee*, 103 F.3d 495, 507 (6th Cir. 1996).

"Instead, it is when the execution of a government's policy or custom, whether made by its lawmakers or those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Monell*, 436 U.S. at 694; *see also Brown*, 520 U.S. at 403-05; *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005); *Gregory*, 220 F.3d at 441. For Campbell County to have liability under 42 U.S.C. § 1983, plaintiffs are required to demonstrate that Campbell County, through its deliberate conduct, was the "moving force" behind the alleged violation or deprivation of their federal constitutional rights. *Brown*, 520 U.S. at 405; *City of Canton v. Harris*, 489 U.S. 378, 389 (1989); *Cherrington v. Skeeter*, 344 F.3d 631, 645 (6th Cir. 2003); *Gregory*, 220 F.3d at 442; *Hale v. Randolph*, 2004 WL 1854179, * 10 (E.D. Tenn. Jan. 30, 2004).

Plaintiffs are also required to show there is a direct causal link between Campbell County's policy or custom and the violation of their federal constitutional rights. Plaintiffs must show that their constitutional rights were violated as a direct result of the execution of a county government policy or custom. *Brown*, 520 U.S. at 405; *City of Canton*, 489 U.S. at 385-86; *Cherrington*, 344 F.3d at 645-46; *Gregory*, 220 F.3d at 442; *Claiborne County*, 103 F.3d at 508; *Gazette v. City of Pontiac*, 41 F.3d 1061, 1066 (6th Cir. 1994); *Hale*, 2004 WL 1854179, at * 10. This is necessary to avoid and prevent imposing *de facto respondeat superior* liability on Campbell County which is prohibited by *Monell*, 436 U.S. 658, and its progeny. *Claiborne County*, 103 F.3d at 508; *Hale*, 2004 WL 1854179, at * 10.

A governmental custom must "be so permanent and well settled as to constitute a custom or usage with the force of law." *Monell*, 436 U.S. at 691; 658, *Claiborne County*, 103 F.3d at 507;

46

*Hale*, 2004 WL 1854179, at * 10.  It must reflect a course of action deliberately chosen from among various alternatives.  *Oklahoma City v. Tuttle*, 471 U.S. 808, 823 (1985); *Claiborne County*, 103 F.3d at 508; *Hale*, 2004 WL 1854179, at * 10.

After reviewing the record, the Court concludes that Campbell County is entitled to summary judgment under Rule 56 on the plaintiffs' 42 U.S.C. § 1983 federal civil rights claims.  Plaintiffs are not entitled to take their case against Campbell County to trial on the basis of mere allegations.  To defeat the summary judgment motion, plaintiffs must come forward with some significant probative evidence and specific facts to support their claims against Campbell County and show that a trial is necessary to resolve genuine issues of material fact in dispute on each element of their claims. *Celotex Corp.*, 477 U.S. at 322; *Anderson*, 477 U.S. at 249; *Van Gorder*, 509 F.3d at 268; *Rodgers*, 344 F.3d at 595.  A scintilla of evidence is not enough.  *Anderson*, 477 U.S. at 252; *Van Gorder*, 509 F.3d at 268; *McLean*, 224 F.3d at 800; *Hartsell*, 87 F.3d at 799; *Mitchell*, 964 F.2d at 581-82.  Plaintiffs have failed to meet their burden under Rule 56.

### E.  <u>Failure to Train or Supervise Employees</u>

Inadequacy of police training   may serve as the basis for imposing liability on a governmental entity under 42 U.S.C. § 1983 only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact.  *City of Canton*, 489 U.S. at 388; *Plinton v. County of Summit*, 540 F.3d 459, 464 (6th Cir. 2008); *Slusher v. Carson*, 540 F.3d 449, 457 (6th Cir. 2008); *Gregory*, 444 F.3d at 753; *Fisher v. Harden*, 398 F.3d 837, 849 (6th Cir. 2005); *Cherrington*, 344 F.3d at 646; *Stemler v. City of Florence*, 126 F.3d 856, 865 (6th Cir. 1997).  This is in keeping with the *Monell* rule that a governmental entity may only be held liable under 42 U.S.C. § 1983 where its policy caused the constitutional violation or deprivation that

47

injured the plaintiff.    As the Supreme Court explains in *City of Canton*, 489 U.S. at 390, the issue is whether a training program is adequate, and if it is not, then the next question is whether such inadequate training can justifiably be said to represent governmental policy.  It may seem contrary to common sense to allege that a governmental entity has a policy of not taking reasonable steps to adequately train its employees.

> But it may happen that in light of the duties assigned to specific officers
> or employees the need for more or different training is so obvious, and
> the inadequacy so likely to result in the violation of constitutional rights,
> that the policymakers of the [governmental entity] can reasonably be said
> to have been deliberately indifferent to the obvious need.  In that event, the
> failure to provide proper training may fairly be said to represent a policy for
> which the [governmental entity] is responsible, and for which the
> [governmental entity] may be held liable if it actually causes injury."

*Id*.; *see also Gregory*, 444 F.3d at 753.

To prevail on a 42 U.S.C. § 1983 claim of failure to train against Campbell County, plaintiffs are required to prove three essential elements: (1) the training program is inadequate to the tasks that the police officers must perform; (2) the inadequacy in the training program is the result of the Campbell County's deliberate indifference; and (3) the inadequacy of training is closely related to or actually caused the plaintiffs' injuries.  *City of Canton*, 489 U.S. at 389-91; *Plinton*, 540 F.3d at 464; *Beard v. Whitmore Lake School District*, 244 Fed. Appx. 607, 610-11 (6th Cir. 2007); *Ciminillo v. Streicher*, 434 F.3d 461, 469 (6th Cir. 2006); *Cherrington*, 344 F.3d at 646; *Carey v. Helton*, 70 Fed. Appx. 291, 294 (6th Cir. 2003); *Hill v. McIntyre*, 884 F.2d 271, 275 (6th Cir. 1989).

## 1.    <u>Adequacy of Training Program</u>

The record contains very little specific details about the nature and extent of the training program of the CCSD deputies.  The training program is only discussed by the parties in vague, general terms.  There is no question raised about the level of training of defendants Webber and

48

Franklin. Campbell County describes Webber and Franklin as experienced, well trained, veteran police officers who were qualified on July 8, 2004, to engage in drug trafficking investigations, making arrests, and searching residences. Plaintiffs do not dispute this.

Plaintiffs focus on the lack of training of defendants Monday, Green, and Carroll. As far as the Court can glean from the record, as of July 8, 2004, Monday, Green, and Carroll had not yet attended the police academy for formal training and they were not POST certified. Defendants have not explained what specific police training, if any, was given to Monday, Green, and Carroll by the CCSD. There is a factual dispute about the adequacy of police training for Monday, Green, and Carroll.

This is not a case where Campbell County and the CCSD failed to provide supervision for untrained deputies. When Monday, Green, and Carroll went to the Siler residence on July 8, 2004, they were under the direct supervision of experienced, veteran police officers Webber and Franklin who were well trained and capable of providing expert guidance and instructions on how to perform the necessary police duties. McClellan and the CCSD did not send inadequately trained deputies Monday, Green, and Carroll to the Siler residence on July 8, 2004, without supervision. The problem was that Webber and Franklin failed to provide proper supervision.

## 2. **Deliberate Indifference**

Although plaintiffs may have shown there is a genuine issue of material fact in dispute concerning the adequacy of the police training provided to deputies Monday, Green, and Carroll by the CCSD, plaintiffs have failed to produce sufficient evidence to create genuine issues of material fact on the second and third elements of their failure-to-train claim.

It is not enough for plaintiffs to merely show that their specific injuries could have been

49

prevented or avoided with better or more police training. *City of Canton*, 489 U.S. at 391; *Mayo v. Macomb County*, 183 F.3d 554, 558 (6th Cir. 1999); *Lewis v. City of Irvine, Kentucky*, 899 F.2d 451, 455 (6th Cir. 1990). "That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability" on Campbell County, "for the officer's shortcomings may have resulted from factors other than a faulty training program." *City of Canton*, 489 U.S. at 390-91. In virtually every instance where a person has his or her constitutional rights violated by a government employee acting under color of state law, a plaintiff in a 42 U.S.C. § 1983 suit will be able to point to something that the governmental entity could have done to help prevent the incident. *Id.* at 392.

Plaintiffs must show is that the inadequacy in the CCSD police training program is the result of deliberate indifference on the part of Campbell County or its policymaker, Sheriff McClellan. Deliberate indifference is a stringent standard of fault for which a showing of simple negligence or even heightened negligence will not suffice. Deliberate indifference "does not mean a collection of sloppy, or even reckless oversights." *Claiborne County*, 103 F.3d at 508; accord *Thomas v. City of Chattanooga*, 398 F.3d 426, 433 (6th Cir. 2005). Deliberate indifference requires that the plaintiffs prove Campbell County or its policymaker, Sheriff McClellan, disregarded a known or obvious consequence of his actions. *Brown*, 520 U.S. at 407, 410; *Plinton*, 540 F.3d at 465; *Beard*, 244 Fed. Appx. at 611; *Gregory*, 444 F.3d at 752; *Fisher*, 398 F.3d at 849; *Stemler*, 126 F.3d at 856. The risk of a constitutional violation and injury arising as a result of the inadequacies in the police training must be plainly obvious. *Brown*, 520 U.S. at 412; *Gregory*, 444 F.3d at 752-53.

There are two ways that plaintiffs may seek to prove that inadequate police training is the result of deliberate indifference on the part of Campbell County. Under the first way, the plaintiffs are required to show that prior to the incident at the Siler residence on July 8, 2004; there was: (1)

50

a clear and persistent pattern of multiple instances of similar unconstitutional conduct by Campbell County police officers involving use of excessive force, violence, or torture of persons; (2) Campbell County or Sheriff McClellan either knew or should have known about it; (3) Campbell County was clearly on notice that the police training in this particular area was deficient and likely to cause injury; and (4) Campbell County or Sheriff McClellan remained deliberately indifferent and ignored the problem. *Plinton*, 540 F.3d at 464; *Slusher*, 540 F.3d at 457; *St. John v. Hickey*, 411 F.3d 762, 776 (6th Cir. 2005); *Fisher*, 398 F.3d at 849; *Thomas*, 398 F.3d at 433; *Cherrington*, 344 F.3d at 646 (one way to prove deliberate indifference is to show that governmental entity has ignored or failed to take corrective action in response to repeated complaints of constitutional violations by its police officers); *Brown v. Shaner*, 172 F.3d 927, 931 (6th Cir. 1999).

The Court finds that plaintiffs cannot show deliberate indifference under this first standard. Plaintiffs do not have proof showing that multiple instances of similar unconstitutional conduct by Campbell County police officers involving the use of excessive force, violence, and/or torture of persons occurred prior to the incident at the Siler residence on July 8, 2004. There is no proof demonstrating that Campbell County and Sheriff McClellan were aware of and ignored a clear, persistent pattern of any such misconduct by Campbell County police officers. There is a lack of proof that Campbell County and Sheriff McClellan were clearly on notice that the police training in this particular area was deficient and likely to cause injury.

In the alternative, a single violation of federal constitutional rights, accompanied by a showing that Campbell County and the CCSD thereafter failed to train its police officers to handle similar recurring situations presenting an obvious potential for such a violation, could trigger liability. *Brown*, 520 U.S. at 409; *Plinton*, 540 F.3d at 464; *Cherrington*, 344 F.3d at 646 (one way

51

to prove deliberate indifference is the failure to provide adequate police training in light of foreseeable consequences that could result from lack of training, such as failure to instruct officers in use of deadly force); *Brown*, 172 F.3d at 931.

The Court finds that plaintiffs also cannot establish deliberate indifference under this second standard. Plaintiffs do not have proof showing that prior to the incident at the Siler residence on July 8, 2004, there occurred a similar incident involving the use of excessive force by police officers and violence amounting to physical and mental torture. What occurred at the Siler residence on July 8, 2004, was an unprecedented, isolated incident. It was not a recurring situation within the experience and history of Campbell County and the CCSD. Plaintiffs are unable to prove that the extraordinary constitutional torts and injuries suffered by the plaintiffs at the Siler residence on July 8, 2004, were a foreseeable consequence of a failure to provide adequate police training to deputies Monday, Green, and Carroll.

Based on the facts in the record, no reasonable jury could find that Campbell County was deliberately indifferent to the plaintiffs' constitutional rights. Plaintiffs cannot show that the inadequacy in the CCSD police training program involved in the instant case is the result of deliberate indifference on the part of Campbell County or its policymaker, Sheriff McClellan. Plaintiffs are unable to prove that Sheriff McClellan disregarded a known or obvious consequence of his actions. *Brown*, 520 U.S. at 407, 410; *Plinton*, 540 F.3d at 465; *Beard*, 244 Fed. Appx. at 611; *Gregory*, 444 F.3d at 752; *Fisher*, 398 F.3d at 849; *Stemler*, 126 F.3d at 856. Based on the facts and circumstances that existed on July 8, 2004, within the CCSD, it would not have been plainly obvious to an objectively reasonable policymaker that inadequacies in the training of deputies Monday, Green, and Carroll would create the risk that the plaintiffs would suffer the particular violations of

52

their constitutional rights and injuries alleged in their complaint. *Brown*, 520 U.S. at 412; *Gregory*, 444 F.3d at 752-53.

### 3. Causal Link:  Inadequate Training Closely Related to or Caused Injury

For Campbell County to held liable under § 1983, there must be a direct causal link between Campbell County's alleged policy of inadequate police training and the violation of the plaintiffs' constitutional rights. *Brown*, 520 U.S. at 405; *City of Canton*, 489 U.S. at 385.  The crucial question is: "Would the injury have been avoided had the employee been trained under a program that was not deficient in the identified respect?" *City of Canton*, 489 U.S. at 391.

Plaintiffs have failed to produce sufficient evidence to create genuine issues of material fact on this third element of causation.  Plaintiffs cannot show that inadequacy in the CSSD police training program is closely related to or actually caused their injuries.  The subject of police training in this case concerns appropriate law enforcement methods for obtaining voluntary consent from a drug trafficking suspect to search his residence.  It does not require any special training for a police officer or any reasonable person to know that the extraordinary methods used by the five deputies at the Siler residence on July 8, 2004, were without a doubt unlawful.  Whether deputies Monday, Green, and Carroll received extensive police training or no training, their understanding of the illegality of their actions would have been the same.

### F. Inadequate Screening of Employment Applications for Job of Deputy

Plaintiffs claim Campbell County was deliberately indifferent because the CCSD had a policy of not adequately screening the background of persons who applied for employment as police officers.  The only two deputies identified by plaintiffs are Pedrin and defendant Shayne Green.

This claim fails.  Pedrin was cited for a misdemeanor of operating a motor vehicle without

53

a valid driver's license which is not a crime of violence. Assuming that Pedrin was found guilty and convicted on this charge, it would not disqualify him from being employed as a deputy sheriff. Pedrin's employment as a deputy sheriff by the CCSD is not probative of showing that Campbell County had a policy of deliberate indifference to the constitutional rights of persons with whom deputy Pedrin might come into contact. It cannot reasonably be inferred that Pedrin, as a result of his citation for operating a motor vehicle without a valid driver's license, would pose a substantial risk of committing constitutional torts against members of the public such as making false arrests without probable cause or using excessive use of force.

With regard to Green, plaintiffs have not established that he had a criminal conviction prior to being employed as a deputy sheriff by the CCSD. A thorough background check into Green's past might have raised some concern about whether it was a good idea to hire Green as a deputy. But this is insufficient for plaintiffs to make out a viable claim against Campbell County and demonstrate that Campbell County had a policy of deliberate indifference. A finding of culpability on the part of Campbell County cannot depend on the mere probability that an inadequately screened police officer will inflict any constitutional injury. Rather, plaintiffs must prove there was inadequate screening of Green's background and that employment of Green as deputy sheriff was "highly likely" to inflict the particular injuries suffered by the plaintiffs in the instant case. The causal connection between Green's background, and the specific constitutional violations and injuries suffered by the plaintiffs must be strong. Only where adequate scrutiny of Green's background would lead an objectively reasonable policymaker to conclude that the "plainly obvious consequence" of a decision to employ Green as deputy sheriff would be the violation of a third-party's federal constitutional rights can the failure to adequately scrutinize Green's background

54

constitute deliberate indifference for purposes of imposing liability on Campbell County under 42 U.S.C. § 1983. *Brown*, 520 U.S. at 410-12; *Fox v. DeSoto*, 489 F.3d 227,(6th Cir. 2007); *Doe v. Magoffin County Fiscal Court*, 174 Fed. Appx. 962, 967-69 (6th Cir. 2006); *Harvey*, 2008 WL 5429646, at ** 5-6.

In *Brown*, a sheriff hired a deputy who, in making an arrest, used excessive force by severely damaging the knee caps of an arrested person. When making the decision to employ the deputy, the sheriff had not paid attention to the deputy's past criminal record or bad driving record. The records in the sheriff' possession showed that the deputy had driving infractions and misdemeanor convictions for public drunkenness, assault, battery, and resisting arrest. *Brown*, 520 U.S. at 401-02. The sheriff was the final policymaker for the county sheriff's department. The Supreme Court held that the plaintiff's 42 U.S.C. § 1983 complaint failed as a matter of law because the sheriff and county were not deliberately indifferent to the plaintiff's federal constitutional rights. Adequate scrutiny of the deputy's background did not reveal it would be "highly likely" that the deputy would inflict the particular injury suffered by the plaintiff. *Brown*, 520 U.S. at 412. The deputy's prior convictions for public drunkenness, assault, battery, and resisting arrest did not make it plainly obvious that the deputy would use excessive force. *Id.* at 411. The Court stated it was not enough that the deputy was an "extremely poor candidate" for his job. *Id.*

The Supreme Court's decision in *Brown*, 520 U.S. 397, compels the conclusion here that plaintiffs fail to meet their heavy burden on the claim of inadequate screening of Green. The background and criminal history of the deputy sheriff in *Brown* is far worse compared to Green's background in the present case. In the wake of *Brown* and its progeny, this Court concludes that based on the meager proof presented, plaintiffs cannot show that Green's employment as a deputy

55

sheriff by the CCSD was "highly likely" to inflict the particular injuries suffered by the plaintiffs. Plaintiffs cannot show that adequate pre-employment screening and scrutiny of Green's background would have led an objectively reasonable policymaker to conclude that the "plainly obvious consequence" of a decision to employ Green as deputy sheriff would be the deprivation or violation of a third-party's federal constitutional rights.

Accordingly, defendant Campbell County's motion for summary judgment on the plaintiffs' federal civil rights claims brought under 42 U.S.C. § 1983 [Doc. No. 38] is **GRANTED** pursuant to Fed. R. Civ. P. 56. All of the plaintiffs' 42 U.S.C. § 1983 federal civil rights claims against defendant Campbell County, Tennessee, are **DISMISSED WITH PREJUDICE**.

## VIII.  Conclusion

The only claims that remain before the Court for adjudication are the plaintiffs' federal civil rights claims against defendants Webber, Franklin, Monday, Green, and Carroll in their individual capacities under 42 U.S.C. § 1983 and the United States Constitution as pleaded in the Ninth Count of the plaintiffs' complaint.

SO ORDERED.

ENTER this the 21st day of April, 2009.


_____*/s/ R. Allan Edgar*_____
R. ALLAN EDGAR
UNITED STATES DISTRICT JUDGE